254 Minn. 272 (1959)
95 N.W. (2d) 91
IN RE ESTATE AND GUARDIANSHIPS OF MARY EDITH WILLIAMS.
IN RE GUARDIANSHIP OF STERLING C. WILLIAMS.
FRANCES M. PURDY
v.
OSCAR A. NORDQUIST AND ANOTHER.
Nos. 37,546, 37,552, 37,547, 37,553, 37,548, 37,554, 37,549, 37,555.
Supreme Court of Minnesota.
February 6, 1959.
*274 Van Valkenburg, Blaisdell & Moss, for Nordquist.
Alvin W. Swanson, for Durham.
Ray G. Moonan, Arthur D. Reynolds, and George A. Lewis, for Frances Purdy.
DELL, CHIEF JUSTICE.
This case involves eight separate appeals from an order of the District Court of Hennepin County in four actions which were consolidated below and have also been consolidated for disposition here. The actions arise out of appeals to the district court from proceedings in the probate court of that county in two general guardianships, one special guardianship, and the estate of Mary Edith Williams, deceased.
From the record and the files in the guardianships and estate which were received in evidence, it appears that in April 1945 Sterling C. Williams, then 48 years old, was declared incompetent by the probate court because of excessive use of alcohol and narcotics. He was unmarried and was the sole heir presumptive and next of kin of his widowed mother, Mary Edith Williams. A general guardian was appointed, and when he resigned two years later Oscar A. Nordquist, an attorney, was named his successor. At the time Nordquist was appointed, the appraised value of Sterling Williams' estate was $16,002.34. From March 1947 until June 1955 an additional $57,834.25 was received by the estate, and during the same period, expenses of $68,828.78 were incurred so that the remainder in the estate at the time of the filing of the final account in June 1955 was $5,007.81.
In March 1949 Nordquist petitioned the probate court for an order allowing him $1,200 as the reasonable value of his services up to that time and $50 a month thereafter. The petition was granted and the order issued. At the same time another petition was filed by Nordquist for an allowance to him of $850 for legal services which he had rendered to Sterling Williams in the guardianship matter. That petition was also *275 granted. Had Nordquist been compensated according to those orders, he would have received a guardianship fee of $4,950 up to June 1955 and an additional fee of $850 for legal services or a total of $5,800. However during this period he obtained an additional order for compensation of $10,000 and paid himself out of his ward's estate at least $32,945 as guardian's fees and for legal services. On December 7, 1955, Nordquist obtained an order allowing him an additional $10,000 as compensation.
During this same period other legal fees were also paid out of Sterling Williams' guardianship estate. An order for the payment of $5,000 was obtained and $4,000 was paid to Frank H. Durham as the ward's personal attorney although Sterling Williams claimed that he had never engaged Durham or authorized him to act in his behalf in any way. Just what Durham did to earn these fees does not satisfactorily appear either from the record before us or from the files of the probate court. A fee of $1,150 was also paid to a firm of attorneys not involved here for the defense of a civil action against the ward for assault and battery. On December 7, 1955, Durham also obtained an order allowing him an additional $5,000 for services.
On November 1, 1949, Nordquist, acting as the guardian of Sterling Williams, petitioned the probate court for the appointment of a general guardian over his ward's mother, Mary Edith Williams, because of her age. The petition was acknowledged before William M. Thomson and was presented to the court in a cover bearing the printed name and address of George W. Tanner. It appears that at that time Nordquist, Thomson, Tanner, and Donald H. Bruer all shared the same law offices although whether they were associated financially is not clear.[1] On the same day Nordquist, again acting as Sterling Williams' guardian, petitioned the probate court for the appointment of a special guardian for Mrs. Williams pending the outcome of the general guardianship proceedings and was himself appointed special guardian over her person. The Northwestern National Bank of Minneapolis was appointed special *276 guardian of her estate and held title to and possession of her real estate and her corporate stocks and bonds.[2] It had acquired the property at various times after January 1947 as the res of a living trust which Mrs. Williams had created at that time, naming the bank as trustee. Through Durham, her personal attorney, Mrs. Williams objected to the appointment of a general guardian over her. Nordquist, however, was appointed by the probate court in January 1950, and an appeal to the district court was taken from that order. There the matter lay dormant until June 30, 1953, when the appeal was dismissed pursuant to a stipulation signed by Durham, on behalf of Mrs. Williams, by Nordquist, individually, and by Tanner, his attorney. In January 1950 Nordquist, on his own petition, was also appointed special guardian of Mrs. Williams' estate, succeeding the bank. The appraised value of her estate was $745,144.25.
In October 1949 Mrs. Williams had revoked the trust and the bank had consented to the revocation. It had, however, retained possession of the assets of the trust pending a determination of Mrs. Williams' competency to revoke it. In May 1950 Durham, as Mrs. Williams' personal attorney, petitioned the probate court for an order directing Nordquist to ratify the revocation and to take the necessary legal steps to reacquire the assets as a part of the guardianship estate. The court issued the order and Nordquist ratified the revocation. Meanwhile proceedings were under way in the district court in connection with the trust. In 1951 the district court found that Mrs. Williams was competent to revoke the trust and entered orders discharging the bank as trustee and directing it to turn over the assets to Nordquist as special guardian. The bank complied with the orders.
The special guardianship continued until June 30, 1953, the date on which the appeal in the general guardianship was dismissed by stipulation. Nordquist became general guardian July 1, 1953, and continued in that capacity until the death of Mrs. Williams, March 16, 1955. During the period of Mrs. Williams' guardianships the total income of her two estates was $284,947.39 and the total disbursements were *277 $378,435.24. During the same period, orders from the probate court for fees for various services totaling $161,200 were obtained for Nordquist, Durham, Tanner, and Thomson. As special guardian Nordquist had obtained orders for fees totaling $33,250 and as general guardian he obtained orders for $39,750. Nordquist also petitioned the court at intervals for orders to pay to Tanner, as attorney for the special guardian, fees totaling $24,700 and to Thomson, as attorney for the general guardian, fees totaling $6,500. Durham obtained orders for fees totaling $34,000 during the special guardianship and $23,000 during the general guardianship  a total of $57,000. During the two guardianships $135,850 was paid to these men as follows: To Nordquist $69,650; to Tanner $20,200; to Thomson $5,000; and to Durham $41,000. At the time of the hearing on the final account the probate court found that they had not been paid in full and held that they were entitled to receive the following amounts: Nordquist $3,500, or $150 more than he had requested; Tanner $4,500; Thomson $1,500; and Durham $16,000.
In each instance, in preparing and presenting a petition for payment, the procedure followed was the same. Nordquist, as guardian, would deliver to Durham, as personal attorney for the ward, a petition for fees for himself and occasionally for one of his attorneys, and Durham would write on the petition in his handwriting that notice of hearing on the petition was waived. On the same day or shortly thereafter Durham, as personal attorney, would present his petition for fees to Nordquist, as guardian, and the latter or someone in his office  Tanner, Thomson, or Bruer  would write on the petition in his handwriting that notice of hearing was waived. All the petitions contained basically the same information; i.e. the petitioner's position; that the estate was large; that much work had been done since the last order for fees; and that it was the appropriate time for a new order to be granted. The petitions were then presented to the probate court and it issued the orders requested. On at least five occasions Nordquist and Durham presented petitions on the same day and for the same amounts; on several others the amounts varied but not the day. On two occasions, April 10 and November 16, 1951, Nordquist, Tanner, and Durham did not present separate petitions but joined together in a single petition which was filed with the court under Tanner's cover. At no time during the special *278 guardianship did the probate court have on file the guardian's annual accounts. Those for the years 1950, 1951, 1952, and the first half of 1953 were not filed until July 1, 1953.
On the petitions involving the Sterling Williams guardianship, Nordquist and Durham joined together and used the cover of the former's firm. Here too both waived notice of hearing on the petitions and, in addition, Durham always waived notice of hearing on the guardian's accounts which Nordquist filed, both for the Sterling Williams guardianship and for the two Mary E. Williams guardianships.
The exact nature of the work performed by these attorneys is at best obscure. Aside from his services in connection with the revocation of Mrs. Williams' trust, for which he rendered a bill of $15,000, there is no tangible evidence of Durham's work other than petitions for his own fees and occasional waivers of notice of the hearings on Nordquist's fees and accounts. The same is true of Tanner. The vast majority of the papers he prepared were petitions to authorize certain leases for tenants in the Sterling Building and the orders authorizing the leases. The leases themselves were nearly uniform and after the first few petitions these also were merely routine matters. Other than these he also concerned himself primarily with preparing petitions for his own and Nordquists' fees, all of which were signed by the latter.
Mrs. Williams died March 16, 1955. The day after her death Nordquist was appointed special administrator of her estate. Her will, naming Durham as attorney for her executor, was admitted to probate and Nordquist was appointed administrator c.t.a. On June 10, 1955, an order was secured allowing the final account of the special administrator and discharging him. That account showed that there had been paid as fees to Durham and Nordquist $5,000 each. Here again both of them had waived notice of hearing. Thereafter Durham apparently prepared and Nordquist signed the necessary instruments, such as petitions to authorize leases. On December 7, 1955, an order of the court was secured which authorized the payment of $15,000 each to both Nordquist and Durham to apply on their respective accounts as administrator and attorney for the administrator.
Through 1955 court orders for fees had been obtained for Nordquist, Durham, Tanner, and Thomson out of the three guardianships and the *279 decedent's estate in the amount of $237,450. Of that amount they had already received $182,795, and it is reasonable to assume that they would have collected the remainder due under the orders if these proceedings had not been commenced.
In March 1956 Frances M. Purdy, a first cousin and alleged sole heir at law of Sterling Williams, joined with the latter and petitioned the probate court to vacate and set aside all the orders authorizing payments to Nordquist, Durham, Tanner, and Thomson in the Sterling Williams guardianship, the two Mary E. Williams guardianships, and the estate of the decedent, Mary E. Williams; to vacate and set aside the orders in the four estates authorizing and approving the various accounts; to reexamine the accounts, readjust them, and surcharge Nordquist with any illegal expenditures; to deny Nordquist and Durham compensation; to remove Nordquist as Sterling Williams' guardian and as the administrator of Mrs. Williams' estate; and to appoint someone else in his place. The basis of their petition was that Nordquist and Durham had conspired to "loot the estate" and to practice "a fraud upon the said Probate Court * * *." As a part of the conspiracy they pointed to the amount of fees for which orders had been obtained and, in part, paid and the methods used by them in so doing. It was made clear that the actions were against Nordquist and Durham personally and not against the estate.
Mrs. Purdy also requested that a probate judge of another county be designated to hear the petition because the probate judge of Hennepin County had signed most of the orders under attack and had expressed himself to the effect that the fees were fair and reasonable and because it was intended that the judge himself be called as a witness. The probate judge of Hennepin County thereupon disqualified himself and appointed another probate judge in his place.
Meanwhile a special guardian was appointed for Sterling Williams upon the petition of Nordquist and upon the motion of that guardian and his attorney, Sterling Williams' petition was dismissed upon the ground that he was incompetent to represent himself. The matter proceeded on Mrs. Purdy's petition alone and it was understood that she, rather than the guardian, was to continue with the case. The probate court found that the orders were not procured through fraud and misrepresentation *280 and denied her petition. She appealed to the district court. In the district court Nordquist and Durham moved for summary judgment in their favor and also moved for an order requiring Mrs. Purdy to file an additional bond against damages in the sum of $200,000 pursuant to M.S.A. 525.714. The court denied the motion for summary judgment but ordered Mrs. Purdy to file an additional damage bond in the amount of $10,000. It also certified the questions presented by the two motions as important and doubtful. The court further ordered Mrs. Purdy, who lives in New York City, to appear in Minnesota for the taking of a deposition within 5 days preceding April 15, 1958. From that order, and from the order requiring the damage bond, she appealed to this court. Nordquist and Durham appealed from the order denying their motion for summary judgment.
1. We shall first consider the issues raised by the motion for summary judgment. Ordinarily, of course, this appeal would not be before us at all. Orders which merely grant[3] or deny[4] motions for summary judgment are interlocutory and hence nonappealable. However the district court certified as important and doubtful the questions presented by the motion, and the appeal is, therefore, proper under § 605.09(4).[5]
2-3. In support of their motion for summary judgment, Nordquist and Durham advance two main propositions: (1) That Mrs. Purdy lacked capacity to maintain the appeals in the district court, and (2) that it appears as a matter of law that the appeals present no grounds for reversal of the order from which they were taken. Nordquist and Durham contend that Mrs. Purdy is without authority to proceed at all in matters relating to Mrs. Williams because she is not related to her and thus has no interest in her guardianships or her estate; that she has no direct interest in Sterling Williams or his estate during his lifetime because a living person has no heirs; that she is not an aggrieved party within the meaning of § 525.712; that she has not been authorized by any court to represent Sterling Williams; and that if anyone has authority to represent him it is his special guardian and no one else.
*281 Section 525.581 provides in part:
"The court on its own motion may, or upon the petition of the guardian or any person interested in the ward or his estate shall, fix the time and place for the hearing on any account * * *." (Italics supplied.)
This statute was enacted in 1935[6] as an amendment to the section of the Probate Code found in G.S. 1923, § 8948. Whether the amendment merely clarified the existing law or enlarged its scope we need not consider for, on the view we take, Mrs. Purdy was properly in court under either version of the statute. Both statutes provide that any interested person may obtain a hearing on an account and in both of them the term "any person" is used as an alternative to the guardian. The logic of this provision is readily apparent. If it were left solely to the guardian to obtain a hearing in the absence of action by the court, then any guardian who, in fact, intended to dissipate his ward's estate might do so unhampered. If, as is alleged in this case, the guardian and the ward's so-called personal attorney were acting in concert, then, since Sterling Williams was incompetent to represent himself, it is obvious that no one would have challenged the accounts had Mrs. Purdy not done so.[7] It is true that a living person has no heirs, but it does not follow that he has no one interested in his welfare. Even if Mrs. Purdy had no direct interest at the outset in Sterling Williams' estate, she, as a first cousin, had sufficient interest in his person to bring this action and we believe also had an interest in seeing that his estate was preserved for his own benefit. It also follows from the fact that Mrs. Purdy was interested in the person of Sterling Williams, and by virtue thereof in his estate, that she also was interested in his mother's estate because, as Sterling Williams is his mother's sole heir, it is likely that all of the property in her estate will eventually come into his estate. We are of the opinion that the phrase "any person interested in the ward or his estate" means just what it says; that it is broad enough to include Mrs. *282 Purdy; and that she is entitled to bring this action without being appointed to do so by the court. This interpretation is in harmony with opinions of former attorneys general which hold that the phrase includes a welfare agent[8] and the State Board of Control.[9] It should also be pointed out that upon oral argument in this court counsel for Durham and Nordquist conceded that in all probability Mrs. Purdy was a proper party to request a hearing in the probate court and concentrated their argument on the proposition that she had no right to appeal to the district court or to proceed further after the new special guardian was appointed.
4. It is admitted that if the new guardian had replaced Mrs. Purdy in the hearings before the probate court and failed to prevail, he would have had the unquestioned right to appeal. Mrs. Purdy, in her brief, points out that the guardian's position is that she was a proper party to initiate and go forward with these proceedings in the probate court and that said guardian appeared at all of the hearings both in the probate and district courts. Nordquist and Durham do not deny this but argue that, when the guardian decided not to appeal to the district court, Mrs. Purdy was foreclosed from doing so and that, by proceeding as she did, she thereby conflicted with the best interests of the ward as represented by the guardian. Upon oral argument in this court Mrs. Purdy's attorney stated that the guardian had consented to her prosecution of the appeals, and this statement was uncontradicted. In this situation Mrs. Purdy stands in the guardian's place and since he might properly have taken this appeal we hold that she likewise could do so.
Aside from this, we are satisfied that she had the right to appeal to the district court. This appeal is governed by § 525.712, which provides that an appeal from the probate court "may be taken by any person aggrieved." Prior to the adoption of this language in L. 1935, c. 72, § 166, the parties who could appeal were limited to "the representative or * * * the creditor" except in cases where the representative declined to appeal and then "any person interested in the estate as creditor, devisee, legatee, or heir" (G.S. 1923, § 8984) might do so in the representative's name. The 1935 statute adopted the phrase *283 "any person aggrieved" and in doing so removed the limitation and expanded the class of persons who might appeal. It is unnecessary for us to determine what limits are now imposed by this language. Clearly it does not allow appeals by persons with no interest at all.[10] However, it is broad enough to cover anybody who is properly before the probate court and is the losing party as the result of an adverse order. This is exactly Mrs. Purdy's position. As we have already pointed out, she had a sufficient interest in Sterling Williams and his estate to institute this proceeding in the probate court. Since she was properly in that court, she had sufficient interest and standing to appeal from its adverse orders.
5. This brings us to the next major point raised by Nordquist and Durham  that they are entitled to judgment as a matter of law. Their basic premise is that Mrs. Purdy's propositions of law and fact do not contain allegations of fraud sufficient to maintain this action in the district court under Rule 9.02 of Rules of Civil Procedure. We are of the opinion that the allegations are sufficient to satisfy the particularity required by the rule.
The requirements for a plea of fraud are satisfied when the ultimate facts are alleged.[11] In this case a large number of wrongful acts are alleged, among them that Nordquist and Durham "entered into an unlawful and illegal conspiracy * * * to raid" the estates "by abstracting therefrom * * * excessive, exorbitant, illegal and unconscionable fees" by surreptitious means. The propositions of law and fact also include the large sums of money for which orders directing payment were obtained and the amounts actually received; the manner in which the parties acted to obtain the orders; the existence of a conspiracy; and the fact that no notice was ever given to any other interested person. If proved, the estate is entitled to recover.[12] Whether or not a conspiracy *284 actually existed and whether the fees were unreasonable present only questions of fact. This is clearly not a case which may be disposed of on motion for summary judgment.[13] The district court properly denied the motion.
6. Since there will be a trial we shall next consider the order requiring Mrs. Purdy to appear in this state for the taking of her deposition. Whatever arguments she wished to make in opposition to the order could only be addressed to the trial court. It is true that there are cases in which the court, in the exercise of its sound discretion, may properly refrain from requiring an adverse party to appear for a deposition. That is the substance of the decisions in Ellis Air Lines v. Bellanca Aircraft Corp. (D. Del.) 17 F.R.D. 395, and Coburn v. Warner (S.D.N.Y.) 12 F.R.D. 188, cited in her brief. However, once the court has made its ruling the principles of those cases cease to be applicable except upon an appeal which is properly before this court. The law is well settled in this state that orders granting or refusing discovery procedure are interlocutory and, therefore, not appealable.[14] There can be no doubt that these decisions extend to and cover orders involving depositions.[15] It follows that that portion of the trial court's order is nonappealable and thus not properly before us at this time.
We note, however, that the date fixed for taking the deposition has already passed. It will, therefore, become necessary for the district court to set a new date if one is again requested. On oral argument in this court, Mrs. Purdy's attorney offered to have her present a few days before trial for that purpose. If that offer is renewed in district court, that court might well conclude that it should receive favorable consideration in view of the special circumstances involved here.
7. The final question before us concerns the order requiring Mrs. *285 Purdy to post the additional bond against damages. Since this is a personal action against Nordquist and Durham and not one against the estate, it is difficult for us to see how the estate could suffer. The expenses which they incur in defending this action cannot be charged against the estate anyway.[16] Section 525.714, therefore, does not appear to be applicable at all. It is urged, however, that the order requiring the damage bond is nonappealable notwithstanding the lower court's certification that the question is important and doubtful. We can see no essential difference between the damage bond in the instant case and security for cost bonds. Whatever authority there is on the question  and there is very little  supports the view that such orders are not appealable.[17] Nor does the certification make the order appealable. Section 605.09(4) provides for a certificate only in cases of orders sustaining or overruling demurrers or their equivalents,[18] which this order does not do. We conclude, therefore, that the issue raised is not properly before us and that that portion of the appeal must be dismissed.
The district court properly denied the motion for summary judgment. The questions relating to the deposition and the damage bond are not properly before us and those appeals must be dismissed.
Affirmed in part, dismissed in part.
NOTES
[1] It is clear, however, that they entered into some sort of association between July 13 and November 10, 1953, since commencing with the latter date all their covers bore the printed title "Tanner, Nordquist, Thomson & Bruer, Attys," or "Attorneys at Law."
[2] The bulk of the real estate was the Sterling Building in downtown Minneapolis, which was valued at $575,000 and was free and clear of encumbrances. A value of $15,000 was placed on the homestead. The stocks were valued at $20,523.25 and the bonds at $134,621.
[3] Shema v. Thorpe Bros. 238 Minn. 470, 57 N.W. (2d) 157.
[4] Settem v. Etter, 236 Minn. 514, 53 N.W. (2d) 467; Annotation, 103 A.L.R. 1104.
[5] House v. Hanson, 245 Minn. 466, 72 N.W. (2d) 874.
[6] L. 1935, c. 72, § 138.
[7] Other relatives whom it is claimed may exist, including a half-brother of Sterling Williams and that brother's children and a cousin in California related to him through his mother, have done nothing. Their existence or whereabouts were never before the courts until this proceeding.
[8] Opinion Attorney General, No. 310-M, Nov. 9, 1925.
[9] Opinion Attorney General, No. 248C-4, March 31, 1936.
[10] See, Bowles v. Dannin, 62 R.I. 36, 2 A. (2d) 892.
[11] See, 8 Dunnell, Dig. (3 ed.) § 3836; Royal Realty Co. v. Levin, 244 Minn. 288, 69 N.W. (2d) 667.
[12] The cases cited by Nordquist and Durham are readily distinguishable. They deal either with complaints which do not sufficiently allege fraud or with verdicts in fraud cases which were not justified by the evidence. The latter type of cases is inapplicable because there has been no trial. The former are inapplicable because we hold that the propositions of law and fact in the instant case sufficiently alleged the fraud. See, 8 Dunnell, Dig. (3 ed.) § 3836.
[13] McCuller v. Workson, 248 Minn. 44, 78 N.W. (2d) 340; Sauter v. Sauter, 244 Minn. 482, 70 N.W. (2d) 351.
[14] Brown v. St. Paul City Ry. Co. 241 Minn. 15, 62 N.W. (2d) 688, 44 A.L.R. (2d) 535; In re Trusteeship Under Will of Melgaard, 187 Minn. 632, 246 N.W. 478; see, Asplund v. Brown, 203 Minn. 571, 282 N.W. 473.
[15] See, Annotation, 37 A.L.R. (2d) 586, 593.
[16] See, 33 C.J.S., Executors and Administrators, § 226d, note 26. And see, In re Estate of Weisberg, 245 Minn. 399, 72 N.W. (2d) 363.
[17] Taylor v. Morton, 227 Ala. 690, 151 So. 853; Christian v. Railroad Co. 136 N.C. 321, 48 S.E. 743, 68 L.R.A. 418; Ostlund v. Ecklund, 42 N.D. 83, 171 N.W. 857; Melancon v. First Nat. Bank (Tex. Civ. App.) 68 S.W. (2d) 538. Cf. Meacham v. Ballard & Co. 180 Minn. 30, 230 N.W. 113.
[18] House v. Hanson, 245 Minn. 466, 72 N.W. (2d) 874.