HARDIN COUNTY SAVINGS
BANK, et al., Appellants,

v.

HOUSING AND REDEVELOPMENT
AUTHORITY OF THE CITY OF
BRAINERD, et al., Defendants,

James H. Bedard, Inc., Respondent.

No. A10–1854.

Supreme Court of Minnesota.

Sept. 19, 2012.

Thomas J. Radio, Best & Flanagan, LLP, Minneapolis, MN; and Stanley J. Thompson, Davis Brown Law Firm, Des Moines, IA, for appellants.

Michael T. Feichtinger, Cally R. Kjellberg, Quinlivan & Hughes, P.A., Saint Cloud, MN, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

This case requires us to determine whether the appellants, six banks, pleaded a negligent misrepresentation claim with particularity under Minn. R. Civ. P. 9.02. The Banks allege that the negligent misrepresentation of the respondent, James H. Bedard, Inc., caused them to be damaged when the Housing and Redevelopment Authority of the City of Brainerd defaulted on bonds held by the Banks. More specifically, in November 2003 the Banks purchased $3.3 million in bonds from the City of Brainerd. The bonds helped finance a residential and commercial development project in Brainerd. In deciding to purchase the bonds, the Banks relied on an appraisal and feasibility study prepared by Bedard. The Banks alleged that Bedard's appraisal and feasibility study overstated the value of the project and the rate at which the land would sell. The Banks further alleged that those overstatements constituted negligent misrepresentation. The Banks commenced an action against Bedard and others in Crow Wing County District Court based on the foregoing allegations. The district court dismissed the action, concluding that the Banks failed to plead their negligent misrepresentation claim against Bedard with particularity. A divided panel of the court of appeals affirmed. We reverse the court of appeals and remand.

In October 2001 a private developer purchased approximately 40 acres of land in Brainerd, Minnesota. The developer sought to develop the land into single-family home lots, and approached the City of Brainerd to request the City's participation by having the City provide tax increment financing (TIF). The City agreed to participate in the project and in December 2002 the City established a TIF district for 20 single-family homes. But the developer failed to make any improvements to the land. In response to this failure, the City approved a resolution to issue $1,085,000 in General Obligation Im-

provement Bonds[1] for improvements to the land. The Housing and Redevelopment Authority of the City of Brainerd (HRA) then took over the project from the developer. At that point, the project involved preparing 96 residential lots for sale and building two model homes. The HRA intended to issue taxable revenue bonds[2] ("bonds") and use the proceeds of the bond sale to acquire and make the improvements to the land.

To aid in the issuance of the bonds, the HRA hired underwriter Dougherty & Company, LLC. The HRA asked Dougherty to prepare a Private Offering Memorandum ("POM"), which, with the HRA's approval, would provide the details of an offer to sell $3.3 million in bonds. The HRA and Dougherty then hired respondent James H. Bedard, Inc., to prepare an appraisal and feasibility study of the project. Bedard appraised the project—which now included 94 residential lots, two commercial lots, and two model homes—at $4,127,670, and valued each residential lot at $43,386. In its feasibility study, Bedard estimated that the HRA would sell all of the lots within a seven-year period (otherwise known as the "absorption rate") by selling approximately 14 lots per year.

Dougherty included Bedard's appraisal and feasibility study in its POM. The record indicates that Dougherty then approached appellant-bondholders Hardin County Savings Bank, Walworth State Bank, Eitzen State Bank, Northern National Bank, Kindred State Bank, and First National Bank (collectively, the "Banks") to initiate discussions about the Banks purchasing the bonds. Dougherty provided the Banks with the POM. Dougherty also informed the Banks that while the bonds likely would mature before a sufficient number of lots were sold to pay off the bonds, "the City would not allow HRA to default on the Bonds because it would harm the City's ability to issue bonds in the future." On November 18, 2003, the Banks bought all of the $3.3 million of bonds issued by the HRA and did so in reliance on the POM and their discussions with Dougherty.

It is undisputed that the project development did not live up to Bedard's projections. In 2004 two model homes were built on the land, but no lots were sold. In 2005 one model home was built on the land, and only one lot was sold. In 2006 one lot was sold. By the end of 2006, 83 lots remained unsold.

The bonds matured on December 1, 2006. Ten days later, on December 11, 2006, the Banks made a "call" on the bonds. In response, the City approved expanding the TIF district within the project and authorized the issuance of another $4,925,000 of General Obligation Bonds, which would serve in part to repay the nearly $2.74 million the HRA owed to the Banks. But before the City issued the General Obligation Bonds, it called a pub-

---

1. State General Obligation Revenue Bonds are usually sold "into the market place. The proceeds from the sale of the bonds are used to pay the cost" of approved buildings and improvements. *State General Obligation Revenue Bonds*, Minn. Mgmt. & Budget, http://www.mmb.state.mn.us/bonds–home/118–118 (last visited Sept. 6, 2012).

2. The complaint describes taxable revenue bonds as follows:

Taxable revenue bonds are commonly sold by municipal entities, such as the HRA, to the public to finance private projects that serve public needs. These bonds are then repaid from funds generated by a dedicated revenue stream from the issuer's project financed with the proceeds of the bond and the issuer's taxing power are oftentimes secured by the underlying Project real estate. In this circumstance, the principal revenue stream was expected to be from the sale of lots and not from HRA's taxing power.

lic hearing to discuss the matter. That hearing was set for April 16, 2007. In the meantime, the City requested that a second appraisal of the project be prepared.

On April 12, 2007, William R. Ludenia completed the second appraisal. In his appraisal, Ludenia estimated that the total value of the 83 remaining lots was $530,000. Four days after receiving Ludenia's appraisal, the City held the public hearing on the issuance of an additional $4,925,000 of General Obligation Bonds. After this hearing, the City rejected the issuance of the additional bonds. On November 16, 2007, the HRA defaulted on the bonds purchased by the Banks. Following this default, the Banks commenced legal actions against several parties.

In April 2008 the Banks commenced an action against the City of Brainerd, Dougherty, and Bedard, Inc., in the United States District Court for the Northern District of Iowa.[3] The Banks asserted several claims under federal securities law, and Iowa and Minnesota law. The federal district court concluded that the Banks failed to sufficiently plead their federal securities claims and dismissed those claims with prejudice. The court then dismissed the remaining state law claims without prejudice.

Following the federal district court's dismissal of their claims, the Banks commenced this action in Crow Wing County District Court against the HRA, Dougherty, two Dougherty employees, and Bedard. The Banks' complaint included three claims against Bedard: a state securities fraud claim under Iowa law (Count VIII), a state securities fraud claim under North Dakota law[4] (Count IX), and a claim for negligent misrepresentation (Count X).

All of the Banks' claims against Bedard arose from the allegation that Bedard's appraisal stated that it "took into account the improvements such as streets, utilities, sidewalks, [and] plantings" (emphasis omitted) when estimating the value of the project and the value of individual lots, but that in reality the appraisal did not take into account the $1,085,000 in improvements. Thus, while Bedard valued the individual lots at $43,386 per lot, the City had to charge an additional "special assessment" to the individual lot buyers in order to recoup the $1,085,000 it spent on improvements. To recoup the money spent on improvements, the City spread the special assessment cost equally among the lots by raising the cost to buyers to $54,688 per lot, $11,302 more per lot than the value Bedard used in his appraisal. Consequently, Bedard's estimate that the project was worth $4,127,670 "overstated the value of the collateral by, at least, $1 million." The Banks also alleged that Bedard's feasibility study "restated the erroneous lot value from the Appraisal and [therefore] failed to properly take into account the special assessment cost on the price of a lot to reach a seven-year absorption rate."

The Banks alleged that the result of Bedard's erroneous appraisal and feasibility study was that the lot prices—which were based on the estimates in Bedard's appraisal—were too high for potential buyers, explaining why only three lots sold. The failure to sell the remaining lots resulted in insufficient revenue to pay the bonds, causing the HRA to default on the bonds.

Specifically, in support of Count VIII, a claim under Iowa law against Bedard, the Banks alleged the following facts:

**3.** Hardin County Savings Bank is an Iowa corporation with a principal place of business in Eldora, Iowa.

**4.** Kindred State Bank is a North Dakota bank with its principal place of business in Kindred, North Dakota.

160. Bedard, Inc. made omissions of material fact and representations to Bondholders as follows:

- Omission of material fact with respect to $1,085,000 in special assessments levied against the lots which resulted in an added cost of $11,262 per residential lot for buyers.

- Representation that the adjusted average base site value was worth $43,386 and that amount *"takes into account the improvements"* such as streets, utilities, sidewalks, plantings in addition to the existing approvals, bonding and tax increment financing." (emphasis added).

- Representations that the real estate was worth $4,127,670 which overstated the value of the real estate by, at least, $1,000,000.

161. The statements and omissions were false and misleading in the following ways:

- Appraisal overvalued the real estate by, at least, $1,000,000.

- Feasibility Study's time period for lot sales was a virtual impossibility due to the cost to acquire a lot and pay the related real estate taxes and special assessments.

162. Bedard, Inc. participated in making the representations and was under a duty to disclose facts to the Bondholders.

163. Bedard, Inc. acted with an intent to deceive, manipulate or defraud, a mental state embracing severe recklessness by means of highly unreasonable omissions or misrepresentations and a motive and opportunity to do so.

The Banks restated these factual allegations in support of Count IX, a claim under North Dakota law against Bedard. In support of the negligent misrepresentation claim in Count X, however, the Banks' complete allegations are as follows:

177. [The Banks] reallege the allegations contained in paragraphs 1 through 176 as though fully set forth herein.

178. Bedard, Inc. negligently supplied information to Bondholders which was false.

179. Bedard, Inc. acted in the course of its business and had a financial interest in supplying the information.

180. Bedard, Inc. intended to supply the information for the benefit and guidance of Bondholders in their business transactions.

181. Alternatively, Bedard, Inc. knew Dougherty intended to supply the information for the benefit and guidance of Bondholders in their business transactions.

182. Bedard, Inc. intended the information to influence the transaction for which the information was supplied.

183. Alternatively, Bedard, Inc. knew that Dougherty intended the information to influence the transaction for which the information was supplied.

184. Bondholders acted in reliance on the truth of the information supplied and were justified in relying on the information.

185. Information supplied by Bedard, Inc. was a proximate cause of the Bondholders' damage, in an amount greater than $50,000.

In November 2008 the HRA, Dougherty, two Dougherty employees, and Bedard filed a motion to dismiss all of the Banks' claims for failure to state a claim under Minn. R. Civ. P. 12.02(e) and for failure to plead fraud with particularity under Minn. R. Civ. P. 9.02. After receiving notice of the motion, the Banks amended their complaint under Minn. R. Civ. P. 15.01, which allows a party to "amend a pleading once

as a matter of course at any time before a responsive pleading is served." Because a Rule 12.02 motion is not a "responsive pleading," the district court allowed the Banks to amend their complaint, resulting in the First Amended Complaint, which is the operative complaint in this case.

The First Amended Complaint appears to be nearly identical to the Banks' original complaint, except that the amended fact section includes allegations of six specific oral statements made by the two Dougherty employees to the Banks. The First Amended Complaint also includes minor modifications to a claim against Dougherty and the two Dougherty employees. The amended complaint does not modify any of the claims against Bedard, including the negligent misrepresentation claim.

In January 2009, shortly after submitting their First Amended Complaint, the Banks also submitted a memorandum in opposition to the motion to dismiss. In their memorandum, the Banks argued that they had sufficiently pleaded all of their claims, including the negligent misrepresentation claim against Bedard. The district court held a hearing on the motion to dismiss. Following this hearing, the court granted the motion to dismiss and dismissed all of the Banks' claims with prejudice. Specifically, the court explained that under Minnesota law, negligent misrepresentation constitutes fraud, and thus "all elements of negligent misrepresentation must be pleaded with specificity." The court concluded that the Banks failed "to

properly plead with particularity a cause of action for negligent misrepresentation" against Bedard because the Banks "only vaguely allege[d] that Bedard negligently supplied false information to [the Banks] and fail[ed] to allege any specific details regarding the alleged negligent misrepresentation." The court also concluded that the Banks failed "to allege that Bedard failed to exercise reasonable care in obtaining whatever information it is that [the Banks] allege was both negligently supplied and false."

After the district court dismissed the Banks' claims, the Banks asked the court to either reconsider its ruling or grant them leave to amend their negligent misrepresentation claim against Bedard.[5] The Banks argued that the court erred when it simultaneously concluded that the Banks had "properly pleaded fraud with regard to the claim of the overvalued real property" but failed to properly plead negligent misrepresentation. The Banks explained:

> The primary distinguishing factor of a negligent misrepresentation claim is a duty, which [the Banks] have set forth with respect to ... Bedard in paragraphs 40 [6] and 162.[7] Given that fraud was properly pled with particularity, a duty was pled and such allegations were incorporated in the negligent misrepresentation count[ ], ... Count X [was] adequately pled.

(Footnotes added.)

The district court denied the Banks' request for reconsideration and request for

---

**5.** The Banks also requested that the court reconsider its dismissal of a negligent misrepresentation claim against Dougherty or grant them leave to amend that claim against Dougherty.

**6.** Paragraph 40 stated:

> Dougherty and HRA also retained Bedard to prepare a Feasibility Study of the Project, which was intended to be relied upon

by Bondholders. (See Exhibit "B" attached hereto and by this reference incorporated herein).

**7.** Paragraph 162 stated:

> Bedard, Inc. participated in making the representations and was under a duty to disclose facts to the Bondholders.

leave to amend their complaint. The court concluded that the Banks had not presented "compelling circumstances" to warrant reconsideration. The court also stated that because the Banks had "had three opportunities, once in the federal court and in the present case, both a Complaint and an Amended Complaint, to properly plead with particularity allegations of fraud," the court was "not persuaded that granting leave to amend the amended complaint at this time would cure the pleading deficiencies." (quoting *Trooien v. Mansour*, 2008 WL 2202720, at *9 (D.Minn. May 23, 2008)). The Banks then appealed to the court of appeals.

A divided panel of the court of appeals affirmed the district court in an unpublished opinion. *Hardin Cnty. Sav. Bank v. Hous. & Redev. Auth.*, A10–1854, 2011 WL 4435339 (Minn.App. Sept. 26, 2011). The court of appeals' majority held that the Banks failed to plead negligent misrepresentation with sufficient particularity for two reasons. *Id.* at *3–4. First, the court concluded that by "realleg[ing] the allegations contained in paragraphs 1 through 176" under the negligent misrepresentation claim, the Banks "simply regurgitate[d] 176 elements of a complex complaint against multiple defendants in one catch-all provision." *Id.* at *3. Specifically, the court said that the Banks' incorporation of allegations by reference in a multiple defendant case "forc[ed] [Bedard] to sift through allegations against other parties to figure out exactly what conduct it was defending. . . ." The court went on to say that there was "no suitable justification as to why" the Banks "could not have summarized their negligent-misrepresentation claim against [Bedard] in the section of the complaint where the count is actually asserted." *Id.*

Second, the court of appeals' majority concluded that even if it viewed the First Amended Complaint in its entirety, "[n]owhere in the complaint do [the Banks] expressly outline what information [Bedard] negligently misrepresented." *Id.* at *4. The court said that if the Banks "would have accused [Bedard] of ignoring the likelihood of a special-assessment fee, miscalculating the improvement costs, inflating the base value of the land, or even outlining why the absorption and discount rates were flawed, [Bedard] would have known the precise accusation it was to defend." *Id.* The court also concluded that the district court did not abuse its discretion in denying the Banks' request for leave to amend. *Id.*

The dissent agreed that the district court did not abuse its discretion when it denied the Banks' request for leave to amend their complaint for a second time. But the dissent disagreed with the court of appeals' conclusion that the Banks had not "pleaded the circumstances constituting fraud with sufficient particularity to satisfy Minn. R. Civ. P. 9.02." *Id.* at *5 (Hudson, J., concurring in part and dissenting in part). Instead, the dissent concluded that the Banks "gave the who, what, when, where, and how of their negligent-misrepresentation claim" and that the Banks' incorporation of allegations by reference was proper under Minn. R. Civ. P. 10.03. *Id.* (internal quotation marks omitted). The dissent noted that the district court had "no difficulty identifying and summarizing the facts underlying the claim, noting that '[t]he heart of the [p]laintiff's claims begins exactly with the October 2003 *Bedard [a]ppraisal and all claims emanate from there.*'" *Id.* (alteration in original) (quoting district court). The dissent also noted that Bedard "had little, if any, difficulty identifying the specific allegations that pertained to it and understood perfectly what was being alleged." *Id.* at *6. The dissent concluded that the district court's and Bedard's identification of the facts and allega-

tions served as proof that the Banks had pleaded their negligent misrepresentation claim with sufficient particularity. *Id.*

Following the court of appeals' affirmance of the district court, the Banks petitioned our court for review. On appeal, the Banks argue that the lower courts erred when they held that the Banks failed to properly plead negligent misrepresentation against Bedard, and request that we remand the action to the district court for trial.

## I.

■ We review de novo whether a complaint sets forth a legally sufficient claim. *Bodah v. Lakeville Motor Express, Inc.*, 663 N.W.2d 550, 553 (Minn.2003). In reviewing the complaint, we consider only the facts alleged in the complaint. *Id.* We accept those facts as true and construe all reasonable inferences in favor of the non-moving party. *Id.*

■ A complaint must "contain a short and plain statement of the claim" demonstrating that the plaintiff is entitled to relief. Minn. R. Civ. P. 8.01. While every averment in the complaint must be "simple, concise, and direct," no specific or technical form of pleading is required. Minn. R. Civ. P. 8.05(a). But parties pleading fraud must meet a heightened pleading standard. Minnesota Rule of Civil Procedure 9.02 provides that "in all averments of fraud, . . . the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." We have said in the past that negligent misrepresentation constitutes fraud. *Gen. Ins. Co. of Am. v. Lebowsky*, 312 Minn. 370, 376, 252 N.W.2d 252, 255 (1977). Thus, under Minn. R. Civ. P. 9.02, the Banks must plead their claim of negligent misrepresentation against Bedard with particularity.

To plead with particularity is to plead the "ultimate facts" or the "facts constituting fraud." *In re Estate and Guardianships of Williams*, 254 Minn. 272, 283, 95 N.W.2d 91, 100 (1959); *Twin Ports Oil Co. v. Whiteside*, 218 Minn. 78, 81, 15 N.W.2d 125, 126 (1944). A party pleads the "ultimate facts" of a fraud claim when it pleads facts underlying each element of the fraud claim. *See Williams*, 254 Minn. at 283–84, 95 N.W.2d at 100.

*Scope of Review*

■ Before beginning our analysis of the Banks' negligent misrepresentation claim, we note that we are not limited in our review to the facts set out in "Count X—Negligent Misrepresentation Bedard, Inc." for two reasons. First, paragraph 177 under Count X states that the Banks "reallege the allegations contained in paragraphs 1 through 176 as though fully set forth herein." The court of appeals concluded that incorporation by reference "undermine[d] the purpose of requiring a fraud claim to be pleaded with particularity." *Hardin*, 2011 WL 4435339, at *3. But the Minnesota Rules of Civil Procedure specifically allow parties to do exactly what the Banks did here—incorporate allegations by reference. Minn. R. Civ. P. 10.03 ("Statements in a pleading may be adopted by reference in a different part of the same pleading. . . ."); *see also Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252–53 (10th Cir.1997) (considering allegations incorporated by reference when determining whether the plaintiff pleaded a fraud claim with particularity, because to do otherwise would "effectively deprive[ ] plaintiff of its . . . right to incorporate by reference"). The Minnesota Rules of Civil Procedure do not require parties to reiterate the full set of relevant factual circumstances under each count. Rather, even when pleading a fraud claim, parties may

plead as they choose as long as the pleadings conform to the applicable rules of civil procedure. *See* Minn. R. Civ. P. 8.05(a) ("No technical forms of pleading ... are required.").

■ Second, the Banks attached four exhibits to their complaint—including Bedard's appraisal and feasibility study—and they specifically incorporated these documents by reference into their complaint as allowed by the Minnesota Rules of Civil Procedure. Minn. R. Civ. P. 10.03 ("A copy of any written instrument which is an exhibit to a pleading is a part of the statement of claim ... set forth in the pleading."). Thus, when considering whether the Banks included adequate factual allegations to meet the heightened pleading standard in Minn. R. Civ. P. 9.02, we consider the complaint in its entirety, including the facts alleged throughout the complaint and the attachments to the complaint. *See Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 740 (Minn.2000) ("[O]ur obligation is to *review the complaint as a whole,* including the documents upon which respondents rely, to determine whether as a matter of law a claim has been stated." (emphasis added)).

*Heightened Pleading Standard Under Minn. R. Civ. P. 9.02*

To meet the heightened pleading standard in Minn. R. Civ. P. 9.02, the Banks must have pleaded the "ultimate facts," or the facts underlying each element of their negligent misrepresentation claim. *See Williams*, 254 Minn. at 283–84, 95 N.W.2d at 100. In Minnesota,

"Negligent misrepresentation" occurs when a person [in the course of his or her (business) (profession) (employment) ] [during a transaction in which he or she has a financial interest]:

1. Supplies false information to another person to guide them in that person's own business transactions, and

2. Fails to use reasonable care or competence in obtaining the information or communicating it to that person, and

3. The other person relied on the information, and

4. The other person was justified in relying on that information, and

5. The other person was financially harmed by relying on the information.

4 Minn. Dist. Judges Ass'n, Minnesota Practice—Jury Instruction Guides, Civil, CIVJIG 57.20 (5th ed.2006); *see Bonhiver v. Graff,* 311 Minn. 111, 121–22, 248 N.W.2d 291, 298–99 (1976). We must determine whether the Banks pleaded facts underlying each of these six elements.

*The Banks' Pleadings*

A review of the facts the Banks pleaded in their complaint will determine whether the Banks pleaded the ultimate facts of their negligent misrepresentation claim.[8] The Banks pleaded the following facts regarding Bedard's appraisal: (1) Dougherty and HRA retained Bedard to prepare the appraisal; (2) "[t]he Bedard Appraisal was specially designed to be relied upon by the Bondholders to induce their purchase of

---

**8.** The court of appeals contended that "[b]y referring ... to the previous 176 paragraphs of the complaint, the [Banks] were forcing [Bedard] to sift through allegations against other parties to figure out exactly what conduct it was defending...." *Hardin,* 2011 WL 4435339, at *3. We disagree. Not only were the Banks allowed to reference the previous paragraphs under Minn. R. Civ. P. 10.03, as we have discussed, but the facts and allegations relevant to Bedard are *not* included in the allegations against other parties. Rather, the facts and allegations relevant to Bedard are included in the initial facts section of the complaint—which applies to all defendants.

the Bonds"; (3) "[t]he Bedard Appraisal, among other things, was also based on flawed absorption and discount rates and opined the real estate (including 2 model homes, 94 residential lots and 2 commercial lots) was worth $4,127,670, which overstated the value of the collateral by, at least, $1 million"; (4) the Bedard appraisal stated that it "took *'into account the improvements'*" that resulted in the special assessment fee, but actually the appraisal did not take the improvements into account, and so buyers were forced to pay an additional $11,302 per lot; and (5) the additional cost to buyers resulted in "virtually none of the lots being sold," which in turn led to "insufficient revenue to pay the bonds" and "caused a default of the bonds and resulted in Plaintiffs being damaged." The Banks' complaint specifically states that "[t]he failure to sell lots resulted from the materialization of the concealed risk caused by the misrepresentation and mistakes in the Appraisal ..."

Second, the Banks pleaded the following facts regarding Bedard's feasibility study: (1) Dougherty and HRA retained Bedard to prepare the feasibility study; (2) the feasibility study "was intended to be relied upon by Bondholders"; (3) the feasibility study "concluded a seven-year period to sell all of the lots in the Development ... and deemed the sale of approximately 14 lots per year was 'a very achievable plan'"; (4) the feasibility study "restated the erroneous lot value form [sic] the Appraisal and relied upon those flawed values and failed to properly take into account the special assessment cost on the price of a lot to reach a seven-year absorption rate"; and (5) the feasibility study "then contradicts the seven-year absorption rate and states a four-year absorption rate would be used in the discount process which further overstated the value of the bondholders collateral." The complaint then describes

the same causation of harm it described in its discussion of the Bedard appraisal.

Third, the Banks pleaded that they "purchased all of the $3,300,000 of Bonds issued by the HRA" in reliance on Bedard's appraisal and feasibility study, and that the HRA ultimately defaulted on those bonds. As discussed earlier, the Banks then pleaded the following facts under the state law securities fraud claims against Bedard: (1) Bedard made an "[o]mission of material fact with respect to $1,085,000 in special assessments levied against the lots"; (2) Bedard made "[r]epresentations that the adjusted average base value was worth $43,386 and that amount" took the improvements into account; (3) the omission of a material fact and the affirmative misrepresentations by Bedard were "false and misleading" because they "overvalued the real estate by, at least, $1,000,000" and presented a "time period for lot sales [that] was a virtual impossibility"; and (4) Bedard "acted with an intent to deceive, manipulate or defraud, a mental state embracing severe recklessness by means of highly unreasonable omissions or misrepresentations...."

Finally, in the negligent misrepresentation claim, the Banks pleaded that Bedard (1) "acted in the course of its business and had a financial interest in supplying the information," (2) "negligently supplied information to Bondholders which was false," (3) "intended to supply the information for the benefit and guidance of Bondholders in their business transactions," (4) "intended the information to influence the transaction for which the information was supplied," (5) that the Banks "acted in reliance on the truth of the information supplied and were justified in relying on the information," and (6) that the "[i]information supplied by Bedard ... was a proximate cause of the Bondholder's damage, in an amount greater than $50,000."

■ Based on the above facts, we conclude that the Banks pleaded the ultimate facts—or facts underlying each element—of their negligent misrepresentation claim. As stated earlier, the first element of the Banks' negligent misrepresentation claim against Bedard requires the Banks to prove that Bedard acted in the course of his business, profession, or employment, or during a transaction in which he has a financial interest. CIVJIG 57.20; *see Bonhiver*, 311 Minn. at 121–22, 248 N.W.2d at 298–99. The Banks pleaded that Bedard was "retained" to prepare both the appraisal and feasibility study, and that Bedard "acted in the course of its business and had a financial interest" in the transaction. These facts sufficiently plead the first element of the negligent misrepresentation claim.

The second element of a negligent misrepresentation claim requires the Banks to prove that Bedard supplied false information for the guidance of others in their business transactions. CIVJIG 57.20; *see Bonhiver*, 311 Minn. at 121–22, 248 N.W.2d at 298–99. The Banks pleaded that the appraisal, which "overstated the value of the collateral by, at least, $1 million," "was specially designed to be relied upon by the Bondholders." The Banks also pleaded that the feasibility study "restated the erroneous lot value," and "was intended to be relied upon by Bondholders." The Banks went on to plead that these "omissions of material fact and representations" were "false and misleading" because they "overvalued the real estate by, at least, $1,000,000" and the estimated "time period for lot sales was a virtual impossibility." These facts underlie the second element of the Banks' claim.

The third element of the Banks' negligent representation claim requires the Banks to prove that Bedard failed to use reasonable care or competence in obtaining the information or communicating it to the Banks. CIVJIG 57.20; *see Bonhiver*, 311 Minn. at 121–22, 248 N.W.2d at 298–99. The Banks pleaded that Bedard "negligently supplied information" to the Banks. By pleading that Bedard was negligent, the Banks necessarily pleaded that Bedard failed to use reasonable care or competence. Likewise, the Banks pleaded that Bedard acted with a "mental state embracing severe recklessness," which also indicates that Bedard failed to use reasonable care or competence. These facts underlie the third element of the Banks' claim.

The fourth element of the negligent misrepresentation claim requires the Banks to prove that they relied on the information supplied by Bedard. CIVJIG 57.20; *see Bonhiver*, 311 Minn. at 121–22, 248 N.W.2d at 298–99. The Banks pleaded that they purchased the bonds "[b]ased on the ... Memorandum dated November 18, 2003, which included [the] Appraisal[ and] Feasibility Study." Thus, the Banks sufficiently pleaded that they relied on the information supplied by Bedard.

The fifth element of the negligent misrepresentation claim requires the Banks to prove that their reliance was justified. CIVJIG 57.20; *see Bonhiver*, 311 Minn. at 121–22, 248 N.W.2d at 298–99. The Banks pleaded that both the appraisal and feasibility study had been designed with the intent that the Banks would rely on the information. The Banks further pleaded that Bedard "intended to supply the information for the benefit and guidance of Bondholders in their business transactions," and "intended the information to influence the transaction for which the information was supplied." The Banks then pleaded that they "acted in reliance on the truth of the information supplied and were justified in relying on the information."

All of these facts underlie the sufficiently pleaded fifth element of the claim.

The final element of the Banks' negligent misrepresentation claim is that the Banks were financially harmed by relying on the information supplied by Bedard. CIVJIG 57.20; *see Bonhiver,* 311 Minn. at 121–22, 248 N.W.2d at 298–99. The Banks pleaded that the HRA defaulted on the bonds, and that the default damaged the Banks "in an amount greater than $50,000." These facts underlie the sufficiently pleaded final element of the Banks' claim.

Because the Banks specifically pleaded facts underlying each of the elements of their negligent misrepresentation claim, we conclude that the Banks pleaded the "ultimate facts" of their claim and thus satisfied the particularity requirement under Minn. R. Civ. P. 9.02. *See Williams,* 254 Minn. at 283, 95 N.W.2d at 100. Therefore, we hold that the court of appeals erred when it concluded that the Banks did not meet the heightened pleading standard under Minn. R. Civ. P. 9.02. Because we hold that the Banks properly pleaded their negligent misrepresentation claim, we do not reach the question of whether the district court abused its discretion when it denied the Banks leave to amend their complaint for a second time. We remand to the district court for further proceedings consistent with our holding.

Reversed and remanded.