*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A23-1275**

Doug Hoskin,
Appellant,

vs.

Josh Krsnak, et al.,
Respondents.

**Filed May 13, 2024**
**Affirmed**
**Bratvold, Judge**

Hennepin County District Court
File No. 27-CV-22-11259

Larina A. Alton, Jevon C. Bindman, Jeremy D. F. Krahn, Maslon LLP, Minneapolis, Minnesota (for appellant)

Arthur G. Boylan, Philip J. Kaplan, Ryan M. Lawrence, Kathryn E. Campbell, Anthony Ostlund Louwagie Dressen & Boylan P.A., Minneapolis, Minnesota (for respondents)

　　Considered and decided by Connolly, Presiding Judge; Bratvold, Judge; and Florey, Judge.*

**NONPRECEDENTIAL OPINION**

**BRATVOLD**, Judge

　　Appellant and one of the respondents each owned an interest in the same limited-liability company. In December 2020, appellant negotiated with that respondent

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

and transferred his interest in the limited-liability company by signing five written agreements. Each agreement included a clause releasing all of appellant's claims related to the limited-liability company. In July 2022, appellant sued that respondent along with a second respondent, the first's solely owned limited-liability company, alleging two counts of fraud and eight other counts. The district court granted respondents' motion to dismiss the complaint for failure to state a claim for relief. The district court also granted respondents' motion for attorney fees and costs as provided in the transfer agreements.

Appellant contends that the district court erred by dismissing the complaint and awarding attorney fees and costs. Appellant argues, first, that the complaint alleges facts sufficient to show that duress and fraud invalidate the releases in the transfer agreements, so he is entitled to pursue all claims. Second, appellant contends in the alternative that the complaint alleges facts sufficient to state a claim for relief in five counts, contrary to the district court's analysis. Third, appellant argues that the attorney-fee provision does not apply and that, even if it did, the district court disregarded his right to a jury trial on respondents' claim for attorney fees and costs. We affirm.

## FACTS

The following summarizes the allegations in the complaint, stating the facts in a light favorable to the nonmoving party and taking the allegations as true.

Appellant Doug Hoskin and respondent Josh Krsnak were "longtime business partner[s]" who were "co-investors and co-members" in businesses "in the real estate and/or parking facility space." Among other investments, they each had "an ownership interest"—Hoskin had 34%; Krsnak had 10%—in Interstate Parking Company LLC (IPC).

2

Hoskin and Krsnak "held numerous [other] businesses and properties through IPC." Krsnak also solely owns respondent JT Manager LLC; we refer collectively to Krsnak and JT Manager LLC as respondents.

IPC was "principally involved in leasing parking facilities and operational management of parking services at those facilities." During the COVID-19 pandemic, the demand for parking declined and IPC "realiz[ed] very little parking income" while still being required to cover lease payments, general overhead, and operational expenses. Facing a revenue shortfall, IPC applied for and received a Paycheck Protection Program (PPP) loan.[1] Because "it became clear that in order to survive, IPC needed additional capital," the IPC members "decided to apply for a Federal Main Street loan" (Main Street loan). Krsnak "promised to manage and attain" the Main Street loan and told Hoskin that he would "get it taken care of." Krsnak planned to secure the Main Street loan from American Equity Bank, stating that he served on the bank's board.

In "a separate business discussion unrelated to the Main Street loan," Krsnak and Hoskin met to discuss the sale and transfer of some "business interests" from Hoskin to Krsnak. On December 17, 2020, Krsnak and Hoskin discussed terms and Krsnak offered to pay Hoskin $350,000.

The next day, Krsnak and Hoskin met again, this time with their attorneys. Krsnak offered $220,000 for Hoskin's "membership units," "represented that he would allocate

---

[1] A PPP loan is from a federal loan program administered by the Small Business Administration during the COVID-19 pandemic.

$470,000 in federal historic tax credits to . . . Hoskin," and "agreed to approval of a salary to . . . Hoskin from IPC at the amount of $150,000 per year."

During the meeting, Krsnak told Hoskin that he would not apply for, or "would otherwise undermine" IPC's efforts to obtain, the Main Street loan, for which the application deadline expired that day. Both Hoskin and Krsnak "acknowledged that, due to the looming deadline to apply" for the Main Street loan, "time was of the essence in applying for and securing financing" through the bank. Krsnak told Hoskin, "I'm not going to get the Main Street [loan] unless we get this done, Doug. If you don't sell to me along the lines and prices that we are discussing now, [IPC] would be in a world of hurt if they don't get that loan."

Hoskin objected to Krsnak's proposal, "which undervalued his membership assets and interest in the projects and real estate assets included in the deal, and which transferred [Hoskin's] interests in them during a depressed market." Krsnak, however, "reiterated that unless . . . Hoskin signed the transfer agreements . . . he would ensure that the Main Street loan program required to ensure the survival of IPC would not occur." Given that "Hoskin's financial and other interests would be irreparably harmed" if IPC failed, Hoskin "had no choice but to sign over his membership units"; he "was forced to sign the membership transfer without change or negotiation, and his execution of the alleged agreements was forced upon him."

4

"Under duress," Hoskin signed five transfer agreements with Krsnak. Each transfer agreement included a paragraph titled, "Release by Hoskin" (the releases):

> Hoskin, on behalf of himself and all of his respective representatives, agents, predecessors, successors and assigns, as well as anyone else claiming rights through them, notwithstanding any claims stated in this Agreement which survive closing, *hereby releases* Manager and Company, and all of their members, officers, directors, agents, employees, representatives, agents, predecessors, successors and assigns *from all claims, demands, damages, actions, and causes of actions, cost and expense, debts, accounts, contracts, agreements, and any other form of liability whatsoever, whether known or unknown, liquidated or unliquidated, fixed or contingent, in law or in equity, arising out of or related to the Company, Hoskin's investment in the Company or the Company's members, officers, directors, agents, employees, including but not limited to any claims that could have been asserted in a lawsuit against any party.* However, this release by Hoskin does not include a release of the indemnification provisions and obligations from Joshua D. Krsnak and Anthony Janowiec for the benefit of Hoskin that are contained in any contribution and indemnification agreement related to investments of Hoskin in the Company.

(Emphasis added.) Hoskin was damaged because his former interest "in these [transferred] entities and their underlying assets are now valued in the millions of dollars."

About 18 months later, in July 2022, Hoskin sued respondents, asserting claims in ten counts related to IPC: fraud (counts I and II), breach of the implied covenant of good faith and fair dealing (count III), promissory estoppel (count IV), breach of oral agreement (count V), negligence (count VI), breach of fiduciary duty (count VII), quantum meruit (count VIII), unjust enrichment (count IX), and declaratory judgment determining that the transfer agreements were unenforceable because Hoskin "had no choice" and executed them under duress (count X).

5

Respondents moved to dismiss under Minn. R. Civ. P. 12.02(e), arguing that Hoskin's complaint failed to allege facts sufficient to state a claim for relief because Hoskin released all claims related to IPC and the complaint did not allege facts sufficient to state a claim for duress or fraud. Hoskin opposed the motion.

After briefing and argument, the district court granted the motion and dismissed the complaint. The district court first concluded that the complaint alleged sufficient facts to show economic duress, which "is a factor to consider in determining whether the allegedly aggrieved party intended to release their legal claims." But because the complaint "does not allege [Hoskin] has or has attempted to return any amount of the consideration received for signing the transfer agreements," the district court concluded that Hoskin has "not taken the actions necessary to void the release agreements" and that the releases are thus valid and "bar[] all of Hoskin's claims." In the alternative, the district court determined that the complaint failed to allege sufficient facts to state claims for relief in counts II, III, VI, VIII, and IX.

Respondents moved for costs and for attorney fees and costs as provided in the transfer agreements. Hoskin opposed the motion, and after a hearing, the district court granted the motion and awarded attorney fees, costs, and disbursements of $38,156.36.

Hoskin appeals.

**DECISION**

In lieu of answering a complaint, a party may move to dismiss for failure to state a claim upon which relief can be granted. Minn. R. Civ. P. 12.02(e). "A claim is sufficient against a motion to dismiss for failure to state a claim if it is possible on any evidence

6

which might be produced, consistent with the pleader's theory, to grant the relief demanded." *Walsh v. U.S. Bank, N.A.*, 851 N.W.2d 598, 603 (Minn. 2014). In other words, "a pleading will be dismissed only if it appears to a certainty that no facts, which could be introduced consistent with the pleading, exist which would support granting the relief demanded." *Halva v. Minn. State Colls. & Univs.*, 953 N.W.2d 496, 501 (Minn. 2021) (quotation omitted). "And all pleadings shall be so construed as to do substantial justice." *Id.* (quotation omitted). Appellate courts "review a district court's dismissal for failure to state a claim de novo." *Walmart Inc. v. Winona County*, 963 N.W.2d 192, 196 (Minn. 2021).

On review, an appellate court must "accept the facts alleged in the complaint as true and construe all reasonable inferences in favor of the nonmoving party." *Engstrom v. Whitebirch, Inc.*, 931 N.W.2d 786, 790 (Minn. 2019). An appellate court, however, "is not bound by the legal conclusions pleaded" in the complaint. *Walsh*, 851 N.W.2d at 607 n.3; *accord Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 692 (Minn. 2014) ("[A] legal conclusion in the complaint does not bind us, and a plaintiff must provide more than mere labels and conclusions."). In reviewing a motion to dismiss, the court may consider documents, including the transfer agreements referenced in Hoskin's complaint, without converting the motion into one for summary judgment. *See In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 497 (Minn. 1995) (stating that, "[i]n deciding a motion to dismiss, . . . the court may consider the entire written contract when the complaint refers to the contract and the contract is central to the claims alleged").

Hoskin raises three main issues on appeal. First, Hoskin contends that the district court erred by dismissing all counts in the complaint based on the releases in the transfer agreements because the complaint alleged facts sufficient to invalidate the releases based on duress and fraud. Second, Hoskin argues that the district court erred in dismissing five counts on alternative grounds. Third, Hoskin contends that the district court erred by awarding attorney fees and costs to respondents based on the language of the transfer agreements and applicable caselaw.

We first consider whether the district court erred by enforcing the releases in the transfer agreements and dismissing the entire complaint. Because we conclude that the complaint fails to allege facts sufficient to support a claim for relief based on duress and fraud and that the releases are therefore valid, we need not consider whether the district court erred in dismissing five counts on alternative grounds. Second, we examine the district court's award of attorney fees and costs.

## I. The district court did not err by dismissing all of Hoskin's claims based on the releases in the transfer agreements.

Hoskin argues that "the release in the transfer agreements was not enforceable because it [was] obtained through fraudulent inducement and duress." Respondents argue that the releases in the transfer agreements are valid and bar all of Hoskin's claims.

"A valid release is a defense to any action on the claims released." *Sorensen v. Coast-to-Coast Stores (Cent. Org.), Inc.*, 353 N.W.2d 666, 669 (Minn. App. 1984), *rev. denied* (Minn. Nov. 7, 1984). "A general release of all claims, known and unknown, will be enforced by the court if the intent is clearly expressed." *Curtis v. Altria Grp., Inc.*,

813 N.W.2d 891, 902, 904 (Minn. 2012) (affirming district court decision to enforce a release in a settlement agreement). Minnesota "presumes that parties to a release agreement intend what is expressed in a signed writing." *Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 776 N.W.2d 172, 176, 181 (Minn. App. 2009) (quotation omitted) (affirming a district court's decision to enforce a forbearance agreement).

While a release "may be set aside if obtained by duress or fraud . . . it is not enough to merely allege that a payment was obtained by duress." *Wallner v. Schmitz*, 57 N.W.2d 821, 824 (Minn. 1953) (citation omitted). A complaint must state facts "which, under the law, constitute duress." *Id*. And appellate courts will affirm a district court's decision to dismiss a complaint for failing to allege facts sufficient to state a claim for duress when the release is unambiguous. *See, e.g.*, *id*. (affirming judgment for defendant on pleadings and enforcing release despite plaintiff's claim of duress); *Zimmerman v. Benz*, 202 N.W. 272, 272-73 (Minn. 1925) (affirming dismissal of complaint on pleadings for failing to allege facts sufficient to set aside release for duress).

### A. The duress allegations in the complaint are insufficient to invalidate the releases in the transfer agreements.

Hoskin argues the releases were not valid because he was under "economic duress" when he signed the transfer agreements, including the release clauses. Respondents contend that the complaint does not allege facts sufficient to state a claim for duress that voids the releases in the transfer agreements.

9

### 1.    Traditional Duress

"[D]uress is available as a defense to a contract only when [the] agreement is coerced by physical force or unlawful threats." *St. Louis Park Inv. Co. v. R.L. Johnson Inv. Co.*, 411 N.W.2d 288, 291 (Minn. App. 1987) (quotation omitted), *rev. denied* (Minn. Oct. 30, 1987). Although other jurisdictions have recognized "economic duress" or "business compulsion," Minnesota has not. *Id*. The supreme court held that Minnesota courts only recognize duress as a defense to a contract when there is "coercion by means of physical force or unlawful threats, which destroys [one]'s free will and compels him to comply with some demand of the party exerting the coercion." *Wise v. Midtown Motors, Inc.*, 42 N.W.2d 404, 407 (Minn. 1950). Our court has described this as "traditional duress theory." *St. Louis Park Inv. Co.*, 411 N.W.2d at 291.

Hoskin's complaint does not allege any physical force or unlawful threat by Krsnak or related to the release. On appeal, Hoskin does not appear to claim otherwise because he argues that he was under "duress caused by economic coercion."[2] But our caselaw is clear that Minnesota does not recognize economic duress as a defense to a contract. *See Bond v. Charlson*, 374 N.W.2d 423, 428 (Minn. 1985) (rejecting "economic stress" as proof of coercion and holding that "[d]uress is available as a defense to a contract only when [the] agreement is coerced by physical force or unlawful threats").

---

[2] In Hoskin's reply brief, he argues that Krsnak threatened him unlawfully. But appellate courts do not consider arguments raised for the first time in a reply brief. *King's Cove Marina, LLC v. Lambert Com. Constr. LLC,* 958 N.W.2d 310, 317-18 n.5 (Minn. 2021).

The complaint's allegations that Krsnak did not fulfill his promise to secure the Main Street loan and reduced his offer to Hoskin when IPC was struggling financially are not facts sufficient to state a claim for duress. Caselaw recognizes that "it is well settled that the mere refusal of a party to pay a debt or to perform a contract is not duress, so as to avoid a contract procured by means of such refusal, although the other party was influenced in entering into it by his financial necessities." *Joannin v. Ogilvie*, 52 N.W. 217, 218 (Minn. 1892). Similarly, "[m]erely driving a hard bargain or wresting advantage of another's financial difficulty is not duress." *St. Louis Park Inv. Co.*, 411 N.W.2d at 291; *see also Zimmermann*, 202 N.W. at 273 ("[I]t is plain that there is nothing unlawful in the endeavor to purchase property at as small a price as possible . . . ."). We conclude that Hoskin's complaint does not allege facts showing that traditional duress invalidates the releases in the transfer agreements.

### 2. Economic Duress as a Factor in Determining Intent to Release Claims

Setting aside traditional duress theory, our caselaw has also recognized that a "release is invalid if the party executed the release under circumstances showing the release was not intended." *Sorensen*, 353 N.W.2d at 669.[3] This caselaw appears to reason that a release of claims by settlement agreement "must manifest an intent to release, discharge, or relinquish a right, claim, or privilege by a person in whom it exists to a person against

---

[3] In the same sentence, *Sorensen* also observed that a release may be set aside for insufficient consideration. *Id*. Because Hoskin's complaint does not allege insufficient consideration and his brief to this court does not make this argument on appeal, we do not discuss this aspect of *Sorensen*.

whom it might have been enforced to be a release." *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010). Generally, "we review the language of the contract to determine the intent of the parties." *Id.*

Even though the complaint does not allege and Hoskin does not argue any ambiguity in the language of the transfer agreements or the releases, the district court did not consider the release language. Instead, the district court discussed *Sorensen* and observed that "economic duress is *a factor to consider* in determining whether the allegedly aggrieved party intended to release their legal claims." (Emphasis added.) The district court determined that three of six factors "suggest Hoskin did not intend to release his claims against defendants by way of the signed releases." The three factors were the "lack of sufficient time to consider the release with counsel, lack of ability to negotiate amendments to the releases, and inequitable conduct in obtaining the releases." The district court concluded that "the release agreements [were] voidable."

Hoskin urges us to agree with the district court that economic duress may be considered and supports his claim to invalidate the releases. Respondents contend in a footnote that the district court's analysis is dicta because the caselaw cited refers "to separate legal theories that Hoskin has not raised."

We are not convinced that the six-factor analysis used by the district court is relevant. First, the district court drew its six-factor analysis from federal caselaw. *Schmitt-Norton Ford, Inc. v. Ford Motor Co.*, 524 F. Supp. 1099, 1102-03 (D. Minn. 1981). This is at best persuasive because a "federal court's interpretation of Minnesota law is not

12

binding on this court." *TCI Bus. Cap., Inc. v. Five Star Am. Die Casting, LLC*, 890 N.W.2d 423, 431 (Minn. App. 2017).

Second, when we consider *Sorensen*, which the district court also cited and on which Hoskin relies in his brief to this court, we see a five-factor analysis. In *Sorensen*, this court affirmed summary judgment by upholding a release signed by a franchisee and rejecting all claims against the franchisor, including fraud and misrepresentation, after considering the franchisee's claim that "he did not intend to release [franchisor] from the claims brought." 353 N.W.2d at 668-69, 671. After reviewing relevant caselaw,[4] we identified "a variety of factors to decide a claimant's intent to release [their] claims." *Id.* We considered (1) the language of the release, (2) the presence of legal counsel before or at the time of execution of the release, (3) "the existence of fraud or misrepresentation," (4) "wrongful concealment of fact or other inequitable conduct" contributing to a party's mistake of fact, and (5) duress, including "duress caused by economic coercion." *Id*. at 669-70; *see also Noble v. C.E.D.O., Inc.*, 374 N.W.2d 734, 744 (Minn. App. 1985), *rev. denied* (Minn. Nov. 18, 1985).

We assume without deciding that *Sorensen* applies to our analysis of Hoskin's economic-duress claim and therefore consider each of the five factors.[5] We note that

---

[4] *Sorensen* cited both *Schmitt-Norton Ford, Inc.*, 524 F. Supp. 1099 (release of contract claims), and *Schmidt v. Smith*, 216 N.W.2d 669 (Minn. 1974) (release of personal-injury claims). *Id.* at 669.

[5] We question whether *Sorensen's* five-factor analysis is appropriate here for at least two reasons. First, *Sorensen* analyzed the franchisee's claim that he did not intend to release any claims. The franchisee in *Sorensen* offered evidence that, when he signed the release, he was executing a form document to terminate the franchise and "did not believe he was

13

Hoskin's brief to this court emphasizes the fifth factor, economic coercion, along with the "immediacy of time pressure" to "force Hoskin" to sign the transfer agreements on "the very last day" to apply for the Main Street loan.

First, we consider the language of the release. In *Sorensen*, we concluded that because the release contained "only language common in the business community," was "short and straightforward," and did not hide "operative words" in "legal jargon" or "fine print," it suggested that the franchisee intended to release his claims. 353 N.W.2d at 669. The language in the releases Hoskin signed is similarly straightforward. While we accept the complaint's allegation that Hoskin signed the transfer agreements "without change or negotiation," the complaint does not plead any facts about the language of the releases to suggest that it was incomprehensible or hid important information. Hoskin's brief to this court does not discuss the language of the release. This factor indicates that Hoskin intended to release his claims.

Second, we consider the presence of legal counsel at the time the transfer agreements were executed. In *Sorensen*, we stated that "the absence of counsel [is] significant when examining the intent to release a claim," while "[t]he presence of counsel

---

giving up any rights." 353 N.W.2d at 668. Unlike the franchisee in *Sorensen*, Hoskin does not allege that he did not intend to sign the releases.

Second, each of the five factors from *Sorensen* involves parol evidence. *Id.* at 669-70. But only when contract language is ambiguous may parol evidence "be considered to determine intent." *Dykes*, 781 N.W.2d at 582. The supreme court has held that, when the language of a release in a settlement agreement "is clear and unambiguous, we enforce the agreement of the parties as expressed in the language of the contract." *Id*. Here, Hoskin does not contend that the release language is ambiguous, so parol evidence is not considered.

14

is a strong factor indicating intent." *Id.* The franchisee in *Sorensen* did not have legal counsel "before or at the time of execution." *Id.* Still, because "the release language [was] simple" and Sorensen was "an experienced businessman," we concluded that the absence of legal counsel did not indicate a lack of intent. *Id.*

Unlike the franchisee in *Sorenson*, Hoskin had his chosen legal counsel present when he discussed the transfer agreements with Krsnak and signed it, including the release clauses. Like the franchisee in *Sorensen*, Hoskin was an experienced businessperson, and the release language was simple. While the complaint alleges that Hoskin was not allowed to negotiate the terms of the sale, the complaint says nothing about any obstacles to obtaining legal advice on the significance of the release language. In his brief to this court, Hoskin claims that "a party can be subject to duress even if they have counsel." Hoskin's claim effectively asks us to look at the other four factors and thus concedes that this factor indicates he intended to release his claims.

Third, we consider the existence of fraud or misrepresentation. In *Sorensen*, we explained that, "[w]hile it is well recognized that releases may be avoided when fraud or misrepresentation exists, the fraud or misrepresentation *must touch execution of the release*." *Id.* at 670 (emphasis added). Hoskin's complaint alleges facts touching on fraud in executing the transfer of membership units but alleges no fact touching on fraud in executing the release. Unlike the franchisee in *Sorensen*, Hoskin does not claim that he was "misled about the nature of what [he] was signing." *Id*. (quotation omitted). While we will consider Hoskin's allegations of fraud more thoroughly below, under *Sorensen*, we conclude that this factor indicates that Hoskin intended to release his claims.

15

Fourth, we consider wrongful concealment of fact or other inequitable conduct. In *Sorensen*, we stated that when inequitable conduct "contributes" to a plaintiff's decision to sign a release, the factor suggests that the plaintiff did not intend to sign a release. *Id.* Hoskin's complaint alleges that Krsnak "did not disclose his plan to attain business leverage, and ultimately Mr. Hoskin's assets," and that this concealment led Hoskin to sign the transfer agreements. But Hoskin's complaint does not allege facts showing that Krsnak's concealment of facts or inequitable conduct contributed to his decision to sign the releases, as described in *Sorensen*. *See id*. Thus, this factor indicates that Hoskin intended to release his claims.

Fifth, we consider economic duress. In *Sorensen*, we explained that economic coercion undermines a party's intent to enter into a release if three elements are satisfied: (A) "[a] party must allege that he involuntarily accepted the terms of the release," (B) "the circumstances allowed only that alternative," and (C) "the other party created the compelling circumstances through coercive acts." *Id.* In *Sorensen*, we concluded that the franchisee's claim for economic duress failed because "the loss of his business and his escalating debts may have caused great stress . . . but, absent coercive acts by [the franchisor], it will not rebut [the franchisee's] intent to execute the release." *Id.*

If we apply *Sorensen's* analysis to Hoskin's complaint—as Hoskin urges us to do— we conclude that the economic-duress allegations in the complaint do not state a claim for relief. While the complaint alleges that the timing of the Main Street loan and IPC's escalating debts "caused great stress," the complaint does not allege coercive acts by Krsnak related to signing the release. *See id*. Simply put, the complaint does not plead that

16

other alternatives, including simply to walk away from the transfer agreements and obtain other financing, were not available to Hoskin. Even though the district court reached a similar conclusion, Hoskin's brief to this court does not argue that he would produce evidence, consistent with pleading duress, that he had no alternative to signing the transfer agreements and the releases. Thus, none of the five factors in *Sorenson* suggest that Hoskin did not intend to enter into the transfer agreements and releases.

To sum up, we conclude that the complaint fails to allege facts sufficient to claim that Hoskin signed the transfer agreements and released his claims under duress. First, the complaint does not allege traditional duress because it does not allege physical force or unlawful threats. Second, if we rely on the analysis in *Sorensen*, the complaint does not allege facts sufficient to support Hoskin's claim that economic duress undermined his intent to enter into the transfer agreements and releases, which are unambiguous. The release language is straightforward, Hoskin is an experienced businessperson and had legal counsel present, Hoskin alleges no fraud or concealment "touching" on the release, and the timing of the Main Street loan and IPC's mounting debts support a claim of "economic stress" but do not rise to duress because the complaint does not allege that Hoskin had no alternative other than to sign the transfer agreements.

Taking all of the allegations in the complaint together and viewing them in a light favorable to Hoskin, the complaint alleges that Krsnak drove a "hard bargain" and took advantage of Hoskin's "financial difficulty." But we have previously held that this is "not duress." *St. Louis Park Inv. Co.*, 411 N.W.2d at 291. Hoskin's brief to this court also fails to articulate what evidence could be produced, consistent with his theory of duress, that

would prove that Hoskin had no alternative. *See Walsh*, 851 N.W.2d at 603. Because none of the five factors in *Sorensen* suggests that Hoskin did not intend to release his claims, we return, as we did in *Sorensen*, to the legal presumption "that parties to a release agreement intend what is expressed in a signed writing." 353 N.W.2d at 670. Thus, we conclude that the releases are valid.

**B.     Hoskin's failure to return the consideration he received from Krsnak does not support the district court's decision to dismiss the complaint.**

The district court dismissed Hoskin's complaint after considering that a party "may repudiate a release entered under duress by returning the consideration paid for in the release agreement." In doing so, the district court discussed *Wise*, 42 N.W.2d at 408-09. The district court first stated that *Wise* "stands for [the] proposition" that Hoskin "is . . . required to return the consideration." The district court next determined that, because the complaint "does not allege [Hoskin] has or has attempted to return any amount of the consideration received for signing the transfer agreements," the releases "remain in full force and effect, barring all of [his] claims."

In his brief to this court, Hoskin argues that he "was not required to return the consideration he received in exchange for his ownership interests prior to filing suit." He contends that a "party who has been "induced to enter a contract by fraudulent misrepresentations may elect to rescind the contract *or* sue for damages" and, at this stage, "may claim either or both alternatively," quoting *Great Plains Educational Foundation, Inc. v. Student Loan Finance Corp.*, 954 N.W.2d 844, 849 (Minn. App. 2020), *rev denied* (Minn. Mar. 30, 2021), and *Vesta State Bank v. Independent State Bank of Minnesota*,

18

518 N.W.2d 850, 855 (Minn. 1994). (Emphasis added.) Krsnak responds that, "because Hoskin kept the consideration he received for the releases, he cannot avoid them by claiming duress." Krsnak contends that no Minnesota case has held that a "plaintiff has a choice between rescinding the release or suing for fraud damages despite the release." Krsnak points out that Hoskin cites caselaw involving fraud, not duress.

First, we examine *Wise* to determine whether Hoskin was required to return the consideration he received before attempting to void the releases. In *Wise*, an employee sued his employer, disputing the amount the employer owed the employee after his employment ended. 42 N.W.2d at 405. In response, the employer threatened to sue the employee for $40,000-$50,000. *Id*. at 406. The employee agreed to accept $200 "in full payment, satisfaction, release and discharge of any claims, demands, or actions he might have against [the employer] arising out of the employment." *Id.* The employee executed the release, and the employer paid the employee $200 plus $100 "cash for his attorneys." *Id.* "Almost immediately thereafter," the employee notified the employer that he was rescinding the release. *Id.* The employee returned the $200 given to him in exchange for the release but kept $100 for his attorneys. *Id.* The employee argued that the release was obtained by duress and was invalid. *Id.* The district court directed a verdict for the employer based on the release, and the supreme court reversed and remanded for a new trial. *Id*. at 405, 409. The supreme court concluded that there was sufficient evidence to generate a question of fact about whether the release was signed under duress based on the employer's threat to sue because the suit was not in good faith. *Id*. at 408. And the supreme court rejected the

employer's argument that the employee's failure to return $100 prevented voiding the release. *Id.* at 409. The court reasoned:

> [The employee's] tender to [the employer] of the $200 received by him for the release was all that was required to void it. A party repudiating a release for duress *is not required to return more than* the consideration given for it. The $100 given by [the employer] after the release was executed was no part of the consideration for the release. . . . [The employer's] contention that [the employee] failed to restore the Status quo by return of the consideration received for the release is plainly without merit.

*Id.* (emphasis added).

The district court emphasized *Wise*'s conclusion that a party repudiating a release for duress "is not required to return more than the consideration given for it." *Id.* From this language, the district court determined that a party repudiating a release must return the consideration received. But *Wise* does not go this far. Nowhere in *Wise* does the supreme court hold that a party *must* return the consideration before repudiating a release. Rather, *Wise* states that when a party repudiates a release, claims duress, and returns the consideration, there is no requirement to return additional fees. *Id.*

Other caselaw underscores our view that consideration need not be returned before voiding a release. In *Marple v. Minneapolis & St. Louis Railway*, the supreme court considered the same issue in the context of rescission of a settlement based on fraud and first stated, "The general rule undoubtedly is that where a party to a contract that is not void, but voidable, seeks to rescind by his own act, he must return or offer to return what he received under the contract." 132 N.W. 333, 334-35 (Minn. 1911) (affirming the district

court's denial of railroad's posttrial motions after jury verdict for plaintiff who sought to rescind a settlement).

But *Marple* adds that "there is no reason for the strict application of the rule when substantial justice can be meted out in the final disposition of the case," such as by deducting the consideration received from the amount of damages recovered. *Id.* at 334. The supreme court ultimately concluded "that it was not necessary" for Marple to return the consideration received in the settlement he sought to rescind because "substantial justice" could be done "when the amount received on the settlement is credited on the verdict." *Id.*

Subsequent caselaw also discusses whether return of consideration is needed to rescind a release. "[A] party repudiating a release cannot be required, as a condition precedent, to return the amount paid upon a specific liquidated demand justly owing, simply because it was paid as part of the transaction of settlement." *Helvetia Copper Co. v. Hart-Parr Co.*, 171 N.W. 272, 274 (Minn. 1919). And a "release procured by fraud may be canceled in an equitable action brought for that purpose. . . . A party is not bound to return or tender money received under a fraudulent release where the adverse party pleads the release as a defense." *Serr v. Biwabik Concrete Aggregate Co.*, 278 N.W. 355, 365-66 (Minn. 1938) (emphasis omitted) (quotation omitted).

Hoskin relies on *Marple* to support his position that even if "some portion of the consideration was specifically payment for the releases, . . . there is no obligation to repay that amount prior to bringing suit" because the consideration can be returned by reducing the verdict or judgment. We agree. Thus, we conclude that the district court erred when it

21

concluded that Hoskin was required to return the consideration before repudiating the releases.

### C. The fraud allegations in the complaint are insufficient to invalidate the releases in the transfer agreements.

Hoskin also claims that the releases are invalid because they were procured by fraud. A heightened pleading standard applies to fraud. Minn. R. Civ. P. 9.02 (stating fraud must be pleaded with particularity). Pleading "with particularity is to plead the 'ultimate facts' or the 'facts constituting fraud.'" *Hardin Cnty. Sav. Bank v. Hous. & Redev. Auth.*, 821 N.W.2d 184, 191 (Minn. 2012). "[U]ltimate facts" of a fraud claim are the "facts underlying each element of the fraud claim." *Id*.

The elements of a claim for fraudulent misrepresentation are

> (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffered pecuniary damage as a result of the reliance.

*Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007) (quotation omitted). Fraud also may be proved by concealment of material facts that causes another party to act in reliance. "[N]ondisclosure may constitute fraud [if there is] a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him." *Richfield Bank & Tr. Co. v. Sjogren*, 244 N.W.2d 648, 650 (Minn. 1976).

22

Hoskin's complaint alleges two fraud theories in separate counts, which we take in turn.

### 1.    Fraudulent Nondisclosure: Count I

The complaint in count I alleges fraudulent nondisclosure by Krsnak of his "plan to attain business leverage, and ultimately Mr. Hoskin's assets." For the reliance element, the complaint pivots to alleging that Hoskin relied on Krsnak's affirmative representation that he would "get it done" and secure the Main Street loan so that Hoskin "did not seek" other "financing options." The complaint also alleges that, on the day the transfer agreements were signed, Krsnak "sprung his plan into action" and threatened not to seek or to undermine the Main Street loan unless Hoskin agreed to the proposed sale terms.

The district court upheld count I as stating a claim for fraudulent concealment based on allegations that Krsnak was a "de facto fiduciary" and concealed material facts because he did not intend to secure the Main Street loan unless Hoskin agreed to the transfer agreements.[6] In his brief to this court, Hoskin claims that we may not consider the legal sufficiency of count I under rule 12.02 because Krsnak did not appeal the district court's decision. But a respondent need not cross-appeal to argue alternative grounds for affirmance. *Stand Up Multipositional Advantage MRI, P.A. v. Am. Fam. Ins. Co.*, 889 N.W.2d 543, 547 n.4 (Minn. 2017) (citing *Day Masonry v. Indep. Sch. Dist. 347*, 781 N.W.2d 321, 331 (Minn. 2010)) ("We have held that respondents need not file a notice

---

[6] For the purposes of appeal, we will assume without deciding that Krsnak had a "legal or equitable obligation to communicate" the omitted facts to Hoskin. *Id.*

of appeal to preserve an argument if that argument was presented below and was an alternative ground on which to affirm a judgment in respondent's favor.").

Thus, we consider Krsnak's arguments that count I fails under rule 12.02 because the complaint alleges that Hoskin "knew the facts underlying his claim *before* he signed the releases." Krsnak cites this court's opinion in *Great Plains Educational Foundation*, which determined that a complaint sufficiently alleged fraudulent inducement of a settlement agreement under rule 12.02 based on claims that plaintiff "did not have knowledge of the fraud until after the parties had entered into" the contract. 954 N.W.2d at 851.

Krsnak's argument is persuasive. The complaint fails to allege facts supporting Hoskin's claim that he relied on the fraudulent nondisclosure in signing the transfer agreements. Instead, the complaint alleges that Hoskin knew of Krsnak's scheme, the reduced price, the deadline for the Main Street loan, and Krsnak's "threat" not to secure the loan at the time Hoskin signed the transfer agreements. Thus, the complaint fails to allege that Hoskin did not know about Krsnak's fraud until after the transfer agreements were signed, and we conclude that the complaint fails to allege facts sufficient to offer evidence of reliance.

At best, count I alleges that, before the day Hoskin signed the transfer agreements, he relied on Krsnak's affirmative representation that he would secure the Main Steet loan and did not explore other financing. But Krsnak's promise to obtain the Main Street loan does not satisfy the first element of a fraud claim because it is not "a past or existing material fact susceptible of knowledge." *Hoyt Props., Inc.*, 736 N.W.2d at 318. Even if we

24

assume that Krsnak's promise to secure the Main Street loan is a "past or existing fact," the complaint does not allege that this representation was false. Indeed, the complaint alleges that Krsnak successfully restored IPC's fortunes after the transfer agreements were signed. Because the complaint alleges that Hoskin knew of Krsnak's alleged fraudulent nondisclosure *before* Hoskin signed the transfer agreements, and because the only reliance alleged relates to a representation that is not claimed to be false, count I does not allege facts sufficient to support Hoskin's claim that the releases were induced by a fraudulent nondisclosure and therefore were invalid.

### 2. Fraudulent Misrepresentation: Count II

The complaint in count II alleges fraudulent misrepresentation based on Krsnak's statement to Hoskin that Krsnak had a special relationship with American Equity Bank and could "attain financing because of this relationship." Alternatively, count II alleges that Krsnak "represented that he could and would ensure the IPC would not attain the needed financing through a Main Street loan." Count II also alleges that Krsnak knew at the time he made these representations that "they were false."

The district court concluded that count II failed to state a claim for relief because it alleged tortious interference with the loan application and not fraudulent misrepresentation. Hoskin's brief to this court contends that the district court misunderstood the complaint's theory, which is that Krsnak "made the threat that he could and would interfere with IPC's financing, when in fact this was a lie." Krsnak argues that the complaint does not allege a false representation because "it is undisputed that Krsnak's 'representation' came true. Krsnak got the [Main Street] loan he allegedly promised," and the complaint does not

25

contend otherwise. While Krsnak's point is valid, it does not grapple with Hoskin's theory about Krsnak's ability to interfere with the Main Street loan.

If we assume, as we must, that the fraudulent misrepresentation was Krsnak's ability to interfere with IPC's financing, then we consider whether count II's allegations allege facts sufficient to support the first element of fraudulent misrepresentation. We conclude that the complaint asserts facts showing the truth of Krsnak's representations about his ability to interfere with the Main Steet loan, not their falsity. The complaint does not allege, nor does Hoskin assert that he will prove, that Krsnak lacked a special relationship with American Equity Bank. Rather, the complaint alleges that Krsnak was on the bank board. Nor does the complaint allege that Krsnak could not prevent or undermine the Main Street loan at the time the transfer agreements were signed.

The complaint also alleges that Krsnak had not yet secured the Main Street loan on the last day for applications. And the complaint asserts that Hoskin "had no choice but to sign" the transfer agreements because IPC needed the Main Street loan to survive. Thus, the only facts that count II asserts is that Krsnak truthfully claimed he could prevent or undermine the Main Street loan. The complaint therefore does not allege an actionable false representation. Rather, it alleges that Krsnak "forced" Hoskin to sign the transfer agreements by threatening not to secure financing as promised. While this may be breach of contract or some other claim, it is not fraudulent misrepresentation.

After carefully reviewing the complaint's factual allegations in support of counts I and II and taking them in the light most favorable to Hoskin, we conclude that the

complaint fails to allege facts sufficient to state a claim for fraudulent nondisclosure or fraudulent misrepresentation as a basis to invalidate the releases.

In sum, when Hoskin signed the transfer agreements, he released "Manager and Company . . . from all claims, demands, damages, actions, and causes of actions . . . whether known or unknown . . . in law or in equity, arising out of or related to the Company, Hoskin's investment in the Company or the Company's members, officers, directors, agents, employees." A valid release is a defense to any action on the claims released. *See Moffat v. White*, 279 N.W. 732, 736 (Minn. 1938) ("A release is not only evidence of the relinquishment but, of itself, extinguishes the pre-existing obligation." (quotation omitted)). Because we conclude that the releases are enforceable and that the complaint does not state a claim for relief from the releases based on traditional duress, economic duress, fraudulent nondisclosure, or fraudulent misrepresentation, we need not discuss whether the complaint otherwise states a claim for relief related to IPC. And although we conclude that the district court erred when it concluded that Hoskin was required to return the consideration before repudiating the release, Hoskin's complaint does not plead facts that would support setting aside the release. Nor does Hoskin's brief to this court articulate what evidence could be proved, consistent with his theories of duress or fraud, to support his claim that the transfer agreements and releases should be invalidated. Thus, the district court did not err in dismissing Hoskin's complaint based on the releases in the transfer agreements.

**II.    The district court did not err by awarding attorney fees based on the fee-shifting provision in the transfer agreements.**

Each of the five transfer agreements provides that "in any action to enforce this agreement, the prevailing party shall be entitled to recover from the other party its costs and attorney fees." The district court determined that this was "a proceeding to enforce this agreement" and awarded attorney fees to Krsnak. We review a district court's decision to award attorney fees for abuse of discretion. *City of Savage v. Formanek*, 459 N.W.2d 173, 177 (Minn. App. 1990), *rev. denied* (Minn. Oct. 25, 1990). We review the district court's factual findings for clear error. Minn. R. Civ. P. 52.01. We review a district court's legal conclusions, such as the interpretation of contract language, de novo. *Harlow v. State, Dep't of Hum. Servs.*, 883 N.W.2d 561, 568 (Minn. 2016); *Roemhildt v. Kristall Dev., Inc.*, 798 N.W.2d 371, 373 (Minn. App. 2011), *rev. denied* (Minn. July 19, 2011).

**A.    This lawsuit and respondents' motion to dismiss are an "action to enforce" the transfer agreements.**

On appeal, Hoskin argues that the district court erred by awarding attorney fees to respondents because "the fee-shifting provision does not apply in this case based on the plain meaning of its terms." Hoskin urges that "[n]either respondents' motion for attorneys' fees nor their motion to dismiss can reasonably be considered an 'action' within the plain meaning of the word" and that "the fee-shifting provision *applies only to a civil complaint* that states a legal cause of action seeking to keep in force or compel compliance with the transfer agreements." (Emphasis added.) Krsnak contends that, within "the plain language of the transfer agreements, the words 'action' and 'enforce' encompass respondents' motion to dismiss."

28

Neither party claims the language in the attorney-fee provision is ambiguous. "If a contract is unambiguous, the contract language must be given its plain and ordinary meaning, and shall be enforced by courts even if the result is harsh." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346-47 (Minn. 2003) (quotation omitted). Paragraph five in each of the transfer agreements states: "Attorney Fees and Costs. In any action to enforce this agreement, the prevailing party shall be entitled to recover from the other party its costs and attorney fees."

We turn to a legal dictionary to consider whether the attorney-fee provision is ambiguous. The common legal meaning of an "action" is "[a] civil or criminal judicial proceeding." *Black's Law Dictionary* (11th ed. 2019) (defining action). The ordinary legal meaning of "enforce" is "[t]o give force or effect to (a law, etc.); to compel obedience to." *Black's Law Dictionary* (11th ed. 2019) (defining enforce). Reading these definitions together with the rest of the attorney-fee provision, we determined that it is not ambiguous, and we may enforce its plain language. We therefore conclude that Krsnak's motion to dismiss Hoskin's complaint based on the releases in the transfer agreements is "a civil judicial proceeding" to "compel obedience to" the transfer agreements.

We also find persuasive Krsnak's argument that, to the extent "any action to enforce this agreement" is ambiguous, then Hoskin's interpretation "would lead to an absurd result." *See Emps. Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge*, 165 N.W.2d 554, 556 (Minn. 1969) (stating that ambiguous contract terms "will not be so strictly construed as to lead to a harsh and absurd result"). If we accept Hoskin's argument that the fee-shifting provision applies only to a civil complaint that seeks to enforce the contract, that would

29

mean that the party who makes it to the courthouse first would recover attorney fees. This interpretation of the fee provision would not only encourage lawsuits and discourage presuit settlement but would also fail to focus on whether a party is enforcing the contract, even though that is the explicit requirement of the attorney-fee provision.

Thus, Krsnak, as the prevailing party, was entitled to attorney fees under the unambiguous language of the attorney-fee provision in the transfer agreements.

**B.    Hoskin's claim that he was entitled to a jury trial on attorney fees lacks merit.**

"[A] jury determines both the liability for a breach of contract and the amount of damages to award of the breach, if any, assuming genuine issues of material fact exist with respect to both questions that warrant submission to a jury." *United Prairie Bank-Mountain Lake v. Haugen Nutrition & Equip., LLC*, 813 N.W.2d 49, 63 n.9 (Minn. 2012). In response to Krsnak's motion for attorney fees and the affidavits submitted in its support, Hoskin submitted a memorandum of law, did not submit evidence, and asserted the claim should be tried to a jury. The district court did not expressly describe its ruling as a summary judgment, but it concluded that a jury trial was not necessary here

> because there is no genuine issue of material fact that the attorney fees requested by [respondents] . . . are reasonable, as their legal team seeking compensation in this matter was reasonably composed, they billed at the prevailing market rates, they did not bill for pre-litigation work, their hours billed for responding to Hoskin's discovery requests were reasonably spent, and [respondents'] computerized legal research was both compensable and reasonable in the amount requested.

On appeal, Hoskin argues that the district court erred because "the reasonableness and amount of fees remained a question of fact" that is "uniquely suited for the jury."

30

Respondents argue that the record shows there was no genuine issue of fact on either the reasonableness or the amount of attorney fees and observed that Hoskin offered no evidence in response to respondents' attorney-fee submission. We consider each of Hoskin's arguments in light of the district court's analysis.

First, in response to Hoskin's challenge to the composition of Krsnak's legal team, the district court reasoned that, although several shareholders were involved in the claim for fees, one shareholder billed at an associate rate, while the other shareholder effectively lowered the overall cost because he had a lower billing rate and billed more hours than the highest-rate shareholder. The district court concluded that a jury therefore could "not draw a reasonable conclusion different" because there was no genuine issue of fact.

Next, regarding Krsnak's attorneys' billing rates, Hoskin argued in his memorandum in opposition that Krsnak "provided no data or information regarding prevailing market rates, which was their burden to meet at the outset." But the district court noted that Hoskin "ignores the cases cited by [respondents] showing their [hourly] rates fall within the range approved by various courts." Given that Hoskin failed to present evidence on different prevailing rates, the district court concluded that no genuine issue of fact remained for trial.

Hoskin also contended that "the requested award includes prelitigation time with respect to reviewing books and records requests, to which [respondents'] counsel failed to substantively respond." The district court found that Hoskin commenced suit when service was completed and therefore that the litigation commenced on July 19, 2022, and

31

respondents did not request attorney fees for any work before that date. The district court concluded, as a result, that there was no genuine dispute of fact on that issue.

Hoskin also argued that respondents' counsel "billed an unreasonable amount of time for reviewing discovery requests to which they also refused to substantively respond" and "failed to engage in good faith with Mr. Hoskin's legitimate discovery requests, essentially copying and pasting the same objection." The district court noted that Hoskin "[did] not argue that the work done by [respondents'] counsel did not take as long as they have billed or that the work done could have been reasonably accomplished in a shorter time"; rather, Hoskin "argue[d] the work performed was inconsistent with the discovery rules." The district court concluded that, although it was "unimpressed" with respondents' discovery responses, their objections to Hoskin's discovery requests "are appropriate objections one could reasonably expect an attorney to make in good faith" and that "[n]o reasonable jury could decide otherwise on this record."

Hoskin finally argued that although "computerized legal research may be considered a component of attorneys' fees, . . . such fees are not necessarily reasonable or recoverable." Hoskin argued that respondents did not "meet their burden of demonstrating that separately billing for Westlaw, Lexis, or any other computerized legal research costs is the prevailing practice in the Twin Cities legal market." He also argued that $5,744.36 is "surely unreasonable." The district court concluded that, because the legal-research costs were billed on a case-specific, line-item basis, and because Krsnak's motion-to-dismiss and reply memoranda were long and demanded significant legal research, there could be no genuine dispute that these costs were reasonable.

We discern no error in the district court's reasoned conclusion, based on this record, that there was no genuine issue of material fact sufficient to warrant a jury trial on the reasonableness and amount of attorney fees.

**Affirmed.**