*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A25-0537**

Shields Law Group, LLC,
Appellant,

Spencer Shields,
Plaintiff,

vs.

Gustafson Gluek PLLC, et al.,
Respondents,

Watts Guerra LLP, et al.,
Respondents.

**Filed January 12, 2026**
**Affirmed**
**Larkin, Judge**

Hennepin County District Court
File No. 27-CV-24-3093

Mark K. Thompson, MKT Law, PLC, Minneapolis, Minnesota (for appellant)

Michael M. Lafeber, Paul M. Shapiro, Hannah S. Fereshtehkhou, Taft Stettinius & Hollister LLP, Minneapolis, Minnesota (for respondents Gustafson Gluek, PLLC, and Daniel Gustafson)

Christopher L. Goodman, Thompson, Coe, Cousins & Irons, LLP, St. Paul, Minnesota (for respondents Watts Guerra LLP, Mikal Watts, and Francisco Guerra)

        Considered and decided by Larkin, Presiding Judge; Wheelock, Judge; and Halbrooks, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**LARKIN**, Judge

Appellant challenges the district court's dismissal of its claims against respondents as untimely. Because appellant's claims were barred under the applicable statutes of limitations, we affirm.

**FACTS**

This appeal stems from a dispute over attorney fees related to litigation arising out of agricultural conglomerate Syngenta's sale of genetically modified corn.[1] The parties are lawyers and law firms who represented individuals in lawsuits against Syngenta between 2014 and 2018. The Syngenta litigation included actions filed in federal courts in Kansas and Illinois, and in state court in Minnesota. A federal multi-district litigation (MDL) was centered in the Kansas federal district court. Appellant Shields Law Group LLC and plaintiff Spencer Shields represented farmers in the underlying Syngenta litigation pursuant to a 30% contingency-fee agreement.

Respondents Gustafson Gluek PLLC, et al. (Gustafson), and Watts Guerra LLP, et al. (Watts), were appointed to leadership roles in the Minnesota cases and to a settlement committee in the MDL.[2] In 2015, Watts recruited appellant to file cases in Minnesota state court rather than in the MDL. Watts indicated that it would be more advantageous to do

---

[1] Our recitation of the relevant facts is based on the allegations in the underlying amended complaint, assumed to be true and viewed in the light most favorable to the claims therein.
[2] We use the terms Gustafson and Watts to refer to both the law firms and individual attorneys within those firms.

so and that Minnesota leadership would not interfere with any private-fee agreements in the Minnesota cases.

Appellant and respondents signed a participation agreement (the contract) on December 7, 2015. Under the terms of the contract, respondents agreed not to propose a class certification or settlement class that would include any cases filed in Minnesota without the consent of counsel of record. Respondents also agreed that they would not interfere with or alter the terms of any fee agreements. Relying on those assurances, appellant filed over 2,000 cases in Minnesota state court.

Syngenta ultimately agreed to a master settlement agreement (MSA) that resolved the claims in all three venues. On March 12, 2018, the terms of the MSA were made public when a signed copy was filed in the MDL. The MSA required final approval of the MDL court before becoming operative. On April 10, 2018, the MDL court preliminarily approved the MSA. And on December 7, 2018, the MDL court gave final approval for the MSA.

In February 2024, appellant and Shields filed a complaint, and in August 2024, appellant alone filed an amended complaint in Minnesota state court alleging seven claims against respondents: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) tortious interference, (4) fraudulent misrepresentation, (5) negligent misrepresentation, (6) unjust enrichment, and (7) declaratory judgment.

Respondents moved for dismissal. The district court granted respondents' motion and dismissed appellant's claims with prejudice. The district court noted issues with the service of appellant's amended complaint, but it determined that it need not resolve any

jurisdictional issue because appellant's claims were barred by the applicable statutes of limitations.

This appeal follows.

**DECISION**

A district court may grant a motion to dismiss if a complaint "fail[s] to state a claim upon which relief can be granted." *See* Minn. R. Civ. P. 12.02(e). If a claim is barred by a statute of limitations, the claim may be dismissed for failure to state a claim. *Pederson v. Am. Lutheran Church*, 404 N.W.2d 887, 889 (Minn. App. 1987), *rev. denied* (Minn. June 30, 1987).

When applying rule 12.02(e), a court considers "only the facts alleged in the complaint, accepting those facts as true, and must construe all reasonable inferences in favor of the nonmoving party." *Finn v. Alliance Bank*, 860 N.W.2d 638, 653 (Minn. 2015) (quotation omitted). We review a district court's grant of a motion to dismiss for failure to state a claim de novo. *DeRosa v. McKenzie*, 936 N.W.2d 342, 346 (Minn. 2019).

We also review the construction and application of a statute of limitations de novo. *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 831 (Minn. 2011). When determining whether a limitations period has expired, we first "determine which statute of limitations applies to the claims asserted." *Id.* at 832. We next determine "when the statute began to run." *Id.* Finally, we determine whether the suit was initiated before expiration of the applicable limitations periods. *See* Minn. Stat. § 541.05 (2024) (requiring an action to be "commenced" within a specified timeframe); Minn. R. Civ. P. 3.01 (stating that an action

4

is "commenced" upon service of the summons, waiver of service, or delivery to a sheriff if certain requirements are met).

As appellant agrees, all seven of its claims were subject to a six-year statute of limitations. *See* Minn. Stat. § 541.05, subds. 1(1) (stating that claims based on an express or implied contract are subject to a six-year statute of limitations if no other limitation is expressly provided), (5)-(6) (listing a six-year limitation for commencement of an action "for any other injury to the person or rights of another, not arising on contract, and not hereinafter enumerated," and an action "for relief on the ground of fraud"); *Block v. Litchy*, 428 N.W.2d 850, 854 (Minn. App. 1988) ("The applicable time limit for bringing an action in unjust enrichment is six years.").

For the purposes of its analysis, the district court concluded that "the earliest possible date[s] for commencement of [appellant's] action on any of [its] claims [were] the date[s] the original summons and complaint were served upon [respondents]," which were in April and May of 2024.[3] Using, as the district court did, the April and May 2024 service dates as the dates appellant initiated suit, we next determine when each of the applicable limitations periods began to run and whether suit was initiated before expiration of the applicable periods.

*Breach of Contract and of Implied Covenant of Good Faith and Fair Dealing*

A limitations period on a contract claim begins to run when the alleged breach occurs, even if the plaintiff is unaware of the facts constituting the breach. *Jacobson v Bd.*

---

[3] The district court found that appellant served the original summons and complaint on Gustafson on April 24, 2024, and on Watts on May 6, 2024.

5

*of Trs. of the Tchrs. Ret. Ass'n*, 627 N.W.2d 106, 110 (Minn. App. 2001), *rev. denied* (Minn. Aug. 15, 2001); *see also Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 803 (Minn. 1989) ("[I]t has long been settled that a cause of action for breach of contract accrues on the breach of the terms of the contract."). "Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing . . . ." *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995).

The relevant contract language states that

> None of the MN MDL Co-Leads will propose to certify any litigation or settlement class that includes any Minnesota Client whose Syngenta Case was filed in Minnesota state court and is pending as of the date of any order granting class certification and whose name is included on the Client List as of the date of such order granting class certification (the "Excluded Clients"); if the MN MDL Co-Leads seek to certify any litigation or settlement class, they will not include in their proposed class definition(s) any Excluded Clients, unless Participating Counsel consents to same.

It also states that "[t]he MN MDL Co-Leads will not seek to interfere with or alter the terms and conditions of any fee agreement with any Client (e.g., reduce or cap the fee of Participating Counsel or its Co-Counsel, if any)."

The district court concluded that the relevant breach of contract occurred when respondents signed the MSA. In doing so, the district court relied on allegations in appellant's amended complaint that identified execution of the MSA as the act constituting the breach. The district court also concluded that the relevant limitations period started to

6

run at the latest on March 12, 2018, when the signed MSA was filed in the MDL, its terms were made public, and appellant became aware of those terms.[4]

As alleged in appellant's amended complaint, respondents' inclusion of appellant's clients in the proposed settlement class without appellant's consent constituted a breach of contract. As appellant indicates in its brief to this court, appellant "was never given the chance to consent" to the MSA, which violated the parties' contract. Because the alleged breach occurred no later than March 12, 2018, when the MSA was filed in the MDL and its terms were made public, and appellant did not serve its complaint until more than six years later, in April and May of 2024, the contract claims were untimely.

*Tortious Interference*

The statute of limitations for a tortious-interference claim generally begins to run on the date of the tortious act. *See Krause v. Farber*, 379 N.W.2d 93, 97 (Minn. App. 1985) (analyzing intentional torts), *rev. denied* (Minn. Feb. 14, 1986). However, there must also be "some damages" for the limitations period to run on a tort claim. *Turner v. IDS Fin. Servs., Inc.*, 471 N.W.2d 105, 108 (Minn. 1991). "An action for negligence cannot be maintained, nor does the statute of limitations begin to run, until damage has resulted from the alleged negligence." *Dalton v. Dow Chem. Co.*, 158 N.W.2d 580, 584 (Minn. 1968).

---

[4] Arguably, the limitations period on appellant's contract claims began to run earlier. *See Jacobson*, 627 N.W.2d at 110 (stating that a limitations period on a contract claim begins to run even if "the aggrieved party was ignorant of the facts constituting the breach"). We need not, however, consider an earlier starting date for the relevant limitations period because appellant's claims are untimely under the later March 12, 2018 date that the district court used.

Ordinarily there is a coincidence of negligent act and the fact of *some damage*. Where that occurs the cause of action comes into being and the applicable statute of limitations begins to run *even though the ultimate damage is unknown or unpredictable*. But it is not the wrongful, i.e., negligent act, which gives rise to the claim. For there must be damage caused by it. Until there is *some damage*, there is no claim and certainly a statute prescribing the time in which suit must be filed . . . can never operate prior to the time a suit would be permitted.

*Id.* at 585 (emphasis added) (quotations omitted).

Caselaw supports "a broad interpretation of the concept of 'some damage.'" *Antone v. Mirviss*, 720 N.W.2d 331, 336 (Minn. 2006). "Where a greater injury remains uncertain, tolling is not appropriate if another injury is a consequence of the same alleged misconduct." *Id.* (quotation omitted).

Appellant's amended complaint alleged:

Upon information and belief, [respondents] knew [appellant] prospectively would earn millions of dollars in fees from its clients' claims, after either judgment or settlement of their cases. Yet, knowing this, [respondents] chose to approve the Syngenta MSA which then cast [appellant's] clients' cases into a federal Settlement Class, and [resulted in] the eventual abrogation of the client contracts that went along for the ride.

Thus, as the district court reasoned, the alleged tortious act was respondents' intentional interference in appellant's fee agreements with its clients, and that interference occurred when respondents approved the MSA. *See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014) (stating that a claim of tortious interference with prospective economic advantage requires an intentional tortious or unlawful interference with the plaintiff's reasonable expectation of economic advantage). Although the record is not clear regarding the precise date on which

8

respondents executed the MSA, they did so on or before March 12, 2018, the date on which a signed copy of the MSA was filed in the MDL.

As to damages, appellant's amended complaint alleges that respondents "disclosed nothing until *after* the MSA had been signed, and by then the process and the resulting damage it would cause [appellant] after Final Approval was well under way." Appellant alleged that it ultimately "suffered millions of dollars in lost fees." However, appellant also alleged that it suffered additional damages when attempting to mitigate the effect of respondents' tortious act. For example, appellant alleged that it "had to file federal appeals to challenge the destruction of the contingent fee contracts and the grossly diminished common benefit fee award in Minnesota" and that it "expended hundreds of additional hours, all uncompensated, as well as incurring appellate attorney fees and expenses, in [its] attempts to mitigate the damage caused by [respondents'] breaches." Finally, appellant's amended complaint alleged that appellant "was forced to file multiple objections in both federal MDL Court and Minnesota state court, in an effort to limit the destruction being inflicted upon [appellant] by the MSA attorney fee allocation process [respondents] agreed to."

In sum, the allegations in appellant's amended complaint—assumed to be true— show that appellant incurred some damage as a result of respondents' alleged tortious act prior to the ultimate fee reduction resulting from the MDL court's final approval of the MSA. Because the complaint was served more than six years after respondents signed the MSA, when the resulting damage "was well under way," appellant's tortious-interference claim was untimely.

*Fraudulent Misrepresentation*

The limitations period for a fraud claim begins to run when, with reasonable diligence, the facts amounting to fraud could have been discovered. *Bustad v. Bustad*, 116 N.W.2d 552, 555 (Minn. 1962). Appellant alleged that respondents "misrepresented material facts through affirmative misstatements and omissions by secretly excluding [appellant], without [appellant's] knowledge and informed consent, from the settlement negotiations and what was taking place." The facts constituting fraud could have been discovered on March 12, 2018, when the signed MSA was filed in the MDL and its terms were made public. Because appellant did not serve its complaint until more than six years later, in April and May of 2024, its fraud claim was untimely.

*Negligent Misrepresentation*

The limitations period for a negligent-misrepresentation claim begins to run when a negligent misrepresentation occurs and the plaintiff suffers financial harm. *See Hardin Cnty. Sav. Bank v. Hous. & Redevelopment Auth. of City of Brainerd*, 821 N.W.2d 184, 192 (Minn. 2012) (setting forth elements of claim). According to appellant's amended complaint, the alleged negligent misrepresentation occurred prior to respondents' execution of the MSA:

> [Respondents] misrepresented material facts through affirmative misstatements and omissions by misleading [appellant] to think [respondents] were taking no action to destroy [appellant's] attorney fee contracts, when in-fact they were taking such action and chose to remain silent and not disclose these facts to [appellant] until *after* the Syngenta MSA was signed by [respondents] and entered into the record before the MDL Court, seeking its preliminary approval of the MSA.

10

Again, respondents signed the MSA on or before March 12, 2018, when a signed copy of the MSA was filed in the MDL. Because the complaint was served more than six years after respondents signed the MSA, when the resulting damage "was well under way," appellant's negligent-misrepresentation claim was untimely.

*Unjust Enrichment Claim*

The limitations period for an unjust-enrichment claim begins to run when the claimant suffers some damage. *See Block*, 428 N.W.2d at 851, 854 (concluding that the statute of limitations for an unjust-enrichment claim began to run when the first overpayment on a contract was made). Again, appellant's complaint indicates that its damages were "well under way" on March 12, 2018, when the signed MSA was filed in the MDL and appellant became aware of the settlement terms. Because appellant's complaint was not served until more than six years later, in April and May of 2024, appellant's unjust-enrichment claim is untimely.

*Declaratory Judgment*

"A party seeking a declaratory judgment must have an independent, underlying cause of action based on a common-law or statutory right." *All. for Metro. Stability v. Metro. Council*, 671 N.W.2d 905, 916 (Minn. App. 2003). "Statutes of limitations apply to a declaratory judgment action to the same extent as a nondeclaratory proceeding based on the same cause of action." *Weavewood, Inc. v. S & P Home Invs., LLC*, 821 N.W.2d 576, 577 (Minn. 2012). As the district court noted, appellant's declaratory-judgment action failed to set forth a separate underlying cause of action and was based on "the same factual allegations and legal theories presented elsewhere in the complaint." Because all of

11

appellant's claims were untimely, appellant's declaratory-judgment action was also untimely.

In sum, the district court did not err by dismissing appellant's claims as untimely. Appellant's arguments to the contrary do not persuade us otherwise. Appellant primarily argues that its claims did not accrue until the MDL court gave its final approval of the MSA in December 2018. Specifically, appellant argues that before final MDL approval of the MSA, there simply was "a proposed putative class action settlement agreement" and the MSA therefore had no legal effect. Appellant asserts that prior to final approval of the MSA, any claim for damages based on the MSA would have been futile. Appellant further asserts that "[b]efore approval, [its] clients' inclusion in the class was not a legal certainty."

We are not persuaded. Appellant's claims were based on respondents' negotiation and signing of the MSA. Although final approval of the MSA determined the amount of the damages in the form of reduced attorney fees, appellant's amended complaint alleged that other damages were "well under way" when respondents signed the MSA, including damages stemming from appellant's attempts to object to and mitigate the effect of respondents' actions.

Appellant relies on the "contingent-accrual rule," citing *Calder v. City of Crystal*, in which the supreme court considered whether a statute of limitations barred a claim for contribution and indemnification. 318 N.W.2d 838, 839 (Minn. 1982). The *Calder* court noted that a cause of action for contribution accrues when "the person entitled to the contribution has sustained damage by paying more than his fair share of the joint obligation," that "[a] third-party claim is thus contingent on the outcome of the original

12

action and upon the payment by one joint tortfeasor of more than his fair share of the common obligation," and that "[w]hen a right is dependent on a contingency, the cause of action accrues and the statute begins to run on the date of the happening of the contingency." *Id.* at 841 (quotations omitted).

We are not persuaded that appellant's rights were contingent on the MDL court's final approval of the MSA. Unlike *Calder*, this case does not involve a claim for contribution and indemnification. And because appellant alleged that some damages were well underway before the MDL court finally approved the MSA—including damages separate from the fee reduction resulting from final MDL approval—appellant's claims were not contingent on that final approval.

For that same reason, we are not persuaded by appellant's reliance on *St. Paul, M. & M. Ry. Co. v. Olson* and the "paramount authority" doctrine. 91 N.W. 294, 295-96 (Minn. 1902). In that case, the supreme court stated that "[w]henever a person is prevented from exercising his legal remedy by some paramount authority, the time during which he is thus prevented is not to be counted against him in determining whether the statute of limitation has barred his right . . . ." *Id.* at 296. Lack of final MDL approval of the MSA did not prevent appellant from exercising its legal remedy.

Lastly, appellant argues that it was not required to sue on its claims before final approval of the MSA because the claims were not fully "ripe." Appellant's brief does not support that assertion with citation to legal authority or legal argument. Arguments based on "mere assertion" and unsupported by legal authority are forfeited "unless prejudicial error is obvious on mere inspection." *Schoepke v. Alexander Smith & Sons Carpet Co.*,

13

187 N.W.2d 133, 135 (Minn. 1971). Because prejudicial error is not obvious, this argument is forfeited.

In conclusion, because appellant's claims were time-barred under the applicable statutes of limitations, we affirm on that ground without addressing the district court's other rulings or the alternative grounds to affirm on which respondents rely.[5]

**Affirmed.**

---

[5] The district court also ruled that (1) appellant's claims were not barred by res judicata, (2) appellant did not waive its right to bring the action, (3) appellant's tort claims were subject to dismissal because appellant did not identify any duty that respondents owed appellant other than their duty under the contract, and (4) appellant's contract claims were subject to dismissal because appellant did not satisfy a notice-and-cure requirement in the contract.

14